John H. Mowbray (NV Bar No. 1140)
jmowbray@spencerfane.com
Mary E. Bacon (NV Bar No. 12686)
mbacon@spencerfane.com
Jessica E. Chong (NV Bar No. 13845)
jchong@spencerfane.com
SPENCER FANE LLP
300 S. Fourth Street, Suite 950
Las Vegas, NV 89101
Telephone: (702) 408-3400
Facsimile: (702) 408-3401

and

Turner A. Broughton (*Applying Pro Hac Vice*)
tbroughton@williamsmullen.com
Justin S. Feinman (*Applying Pro Hac Vice*)
jfeinman@williamsmullen.com
WILLIAMS MULLEN, PC
200 South 10th Street, 16th Floor
Richmond, VA  23219
Telephone:  804.420.6000

Camden R. Webb (*Applying Pro Hac Vice*)
cwebb@williamsmullen.com
WILLIAMS MULLEN, PC
301 Fayetteville Street, Suite 1700
Raleigh, NC  27601
Telephone:     703.760.5232
*Counsel for Defendant FN America*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| JAMES PARSONS, individually and as Special Administrator of the Estate of Carolyn Lee Parsons, and ANN-MARIE PARSONS,<br><br>Plaintiffs**,**<br><br>v.<br><br>COLT'S MANUFACTURING COMPANY LLC, *et. al*.,<br>Defendants, | Case No.<br><br><br><br>**DEFENDANT FN AMERICA'S NOTICE OF REMOVAL** |

1

2    Defendant FN America ("FN America" or "Moving Defendant"), by counsel, pursuant to

3    28 U.S.C. §§ 1332, 1441, 1446, and Local Civil Rules IA 10-1 and 10-2, hereby gives notice of

4    the removal of this action from the District Court for Clark County, Nevada, to the United States

5    District Court for the District of Nevada.   In support of removal, FN America provides the

6    following required "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a);

7    *see also, Dart Cherokee Basin Operating Co., LLC v. Owens*¸ 135 S. Ct. 547, 553 (2014) ("By

8    design, § 1446(a) tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules

     of Civil Procedure.").

9                                 **INTRODUCTION AND BACKGROUND**

10         1.    This matter is being removed because there is complete diversity between the

11   Plaintiffs and all of the named defendants in this action, thereby affording this Court with original

12   jurisdiction pursuant to 28 U.S.C. §§ 1332(a).

13         2.    On or about July 2, 2019, Plaintiffs James Parsons, individually and as Special

14   Administrator of the Estate of Carolyn Lee Parsons, and Ann-Marie Parsons ("Plaintiffs") filed a

15   complaint (the "Complaint") seeking damages from, *inter alia*, FN America in the District Court

16   for Clark County, Nevada (the "State Court Action") (State Court Action No. A-19-797891-C).  A

17   true and accurate copy of the Complaint filed by Plaintiffs in the State Court Action is attached

18   here as Exhibit A.

19         3.    On or about July 2, 2019, Plaintiffs also filed an Initial Appearance Fee Disclosure

20   (NRS Chapter 19) along with their Complaint. A true and correct copy of the Initial Appearance

21   Fee Disclosure filed by Plaintiffs in the State Court Action is attached here as Exhibit B.

22         4.    The online docket in the State Court Action indicates that summonses have been

23   electronically issued for the named defendants, but there is no indication that Plaintiffs have

24   properly served any of the named defendants in the State Court Action.  Neither have any of the

25   named defendants made a voluntary appearance.  A true and accurate copy of the online docket for

26   the State Court Action is attached here as Exhibit C.

27

28

1

**DIVERSITY JURISDICTION EXISTS**

2     5.      This action qualifies for removal to this Court because complete diversity exists

3 between Plaintiffs and the named defendants and the amount in controversy will exceed the sum

4 of $75,000.00, exclusive of punitive damages, costs and attorneys' fees, as required for original

5 jurisdiction under 28 U.S.C. § 1332(a).

6     6.      Plaintiffs allege that they are both domiciled in the State of Washington, not in the

7 State of Nevada. (Ex. A, Compl. ¶¶ 19–20.)

8     7.      FN America is not domiciled in the State of Washington.

9     8.      Based upon the factual allegations contained in the Complaint filed in the State

10 Court Action, none of the other named defendants are domiciled in the State of Washington either.

11 As such, complete diversity exists in this action. *See, Owen Equip. & Erection Co. v. Kroger*, 437

12 U.S. 365, 373, 98 S. Ct. 2396, 2402, 57 L. Ed. 2d 274 (1978) ("[D]iversity jurisdiction does not

13 exist unless each defendant is a citizen of a different State from each plaintiff.").

14     9.      The amount in controversy in this case exceeds the jurisdictional requirements for

15 subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The Complaint expressly identifies

16 damages "in excess of $15,000.00," but due to the claims arising from the alleged wrongful death

17 and loss of companionship of the Plaintiffs' daughter, Carolyn Lee Parsons, the damages pursued

18 will easily eclipse the jurisdictional minimum. *See, e.g., Kammerdiener v. Ford Motor Co.*, Case

19 No. 5:09-cv-02180-PSG-VBK, 2010 WL 682297, at *2 (C.D. Cal. Feb. 24, 2010) (finding the

20 amount in controversy facially apparent in wrongful death actions).

21

**THE LOCAL DEFENDANT RULE DOES NOT APPLY**

22     10.     In addition to claims against firearm manufacturers, Plaintiffs have pursued

23 additional claims against local firearm retailers, such as defendant Discount Firearms & Ammo,

24 LLC, which is a Nevada limited liability company. (*See* Ex. A, Compl. ¶ 30.)

25     11.     Under 28 U.S.C. § 1441(b)(2), a "civil action otherwise removable solely on the

26 basis of the jurisdiction under section 1332(a) of this title [(the diversity statute)] may not be

27 removed if any of the parties in interest properly joined ***and served*** as defendants is a citizen of the

28

1    State in which such action is brought." *Id.* (emphasis added).  This statutory rule is commonly

2    referred to as the "Local Defendant Rule."

3        12.    Based on FN America's analysis of the state-court docket, none of the forum

4    defendants, including Discount Firearms & Ammo, LLC, have been properly served with a

5    summons and a copy of the Complaint.  In fact, Plaintiffs have not served any of the named

6    defendants in the State Court Action.

7        13.    Because there is a complete lack of service, there are no properly joined "***and***

8    ***served***" forum defendants that might defeat removal on diversity grounds under § 1441(b)(2), i.e.,

9    the Local Defendant Rule.  *See, e.g., Lamy v. United Parcel Serv., Inc.,* Case No. 2:09-cv-01890-

10   LRH-RJJ, 2010 WL 1257931, at *2 (D. Nev. Mar. 27, 2010) (only considering the domicile of the

11   parties joined ***and served*** at the time of removal).

12       14.    The language of the Local Defendant Rule is unequivocal: it applies only to

13   defendants which are "properly joined *and served.*"  *See,* 28 U.S.C. § 1441(b)(2); *see also, Davis v.*

14   *Hoffman-LaRoche, Inc*., Case No. 13-5051 JSC, 2014 WL 12647769, at *2 (N.D. Cal. Jan. 14,

15   2014), *report and recommendations adopted*, 2014 WL 12647768 (N.D. Cal. Jan. 31, 2014)

16   (holding "that the language of Section 1441(b)(2) is clear: the local-defendant rule applies only to

17   those defendants which have been properly *joined and served*" (emphasis in original)).

18       15.    Removal of the state-court action is therefore proper because no "part[y] in interest

19   properly joined ***and served*** as [a] defendant[] is a citizen of [Nevada]." 28 U.S.C. § 1441(b)(2)

20   (emphasis added); *see also, Regal Stone Ltd. v. Longs Drug Stores California L.L.C.*, 881

21   F.Supp.2d 1123, 1127-28 (N.D. Cal. 2012).

22       **<u>FEDERAL QUESTION JURISDICTION EXISTS</u>**

23       16.    Alternatively, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 because of

24   federal questions arising from Plaintiffs' pursuit of wrongful death damages from several

25   manufacturers of firearms that will necessarily require the interpretation and application of federal

26   law, including but not limited to, the National Firearms Act (the "NFA") (26 U.S.C. § 5801, *et*

27   *seq*.) and the Protection of Lawful Commerce in Arms Act (15 U.S.C. § 7903, *et seq.*).

28

17. Generally, the "well-pleaded complaint rule" governs whether a complaint raises a federal question or arises under federal law. Under the well-pleaded complaint rule, "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). But a case involving only state-law claims can give rise to federal-question jurisdiction "if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164 (1997); *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal.,* 463 U.S. 1, 13 (1983) (case arises under federal law when "federal law creates the cause of action or ... the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law").

18. Here, Plaintiffs' causes of action against certain firearm manufacturers are all based upon an alleged failure to comply with federal firearm standards because the AR-15 rifles used in this tragic event were modified by the gunman to allow for automatic rates of fire. (*See* Compl. ¶¶ 8–18.) Specifically, Plaintiffs expressly allege that the firearm manufacturing defendants designed their rifles in violation of 18 U.S.C. 922(b)(4). (*Id.* ¶¶ 172, 192, 196, 198, 204–06.)

19. Because Plaintiffs base their claims, in part, on alleged noncompliance with federal regulations and violation of federal law, adjudication of the Plaintiffs' claims will require resolution of substantial federal questions such that the lawsuit originally could have been filed in federal court. 28 U.S.C. § 1441(a); *see also, Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005) ("[I]n certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues.").

### REMOVAL IS PROCEDURALLY PROPER

20. A defendant must file a notice of removal within thirty days after receiving service of process. *See,* 28 U.S.C. 1446(b); *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.,* 526 U.S. 344, 356 (1999). The Moving Defendant has not been served, so the thirty-day clock has not even begun to run. As such, notice is timely.

21. In accordance with 28 U.S.C. 1441(a), venue is proper in this Court because the United States District Court for the District of Nevada is the federal judicial district embracing the

1   District Court of Clark County, Nevada, where the Plaintiffs originally filed the State Court
2   Action.

3        22.    All defendants properly served must consent to removal. *See,* 28 U.S.C. §
4   1446(b)(2)(A) ("When a civil action is removed solely under section 1441(a), all defendants *who*
5   *have been properly joined and served* must join in or consent to the removal of the action")
6   (emphasis added).  Here again, no defendants have been served, so no consent is required to
7   supplement FN America's Notice of Removal.

8        23.    Simultaneously with the filing of this Notice, in accordance with 28 U.S.C. §
9   1446(d), FN America will serve a copy of this Notice upon the Plaintiffs and will file a copy of the
10  Notice with the Clerk for the District Court of Clark County, Nevada.

11       24.    FN America has provided the required "short and plain statement of the grounds for
12  removal," *see* 28 U.S.C. § 1446(a), and the Moving Defendant has satisfied all other requirements
13  necessary to remove this action to federal court.

14       25.    Nothing in this Notice of Removal should be interpreted as a waiver or
15  relinquishment of FN America's right to assert any and all defenses or objections to the Complaint,
16  including lack of personal jurisdiction.  If there are any questions that arise as to the propriety of
17  removal of this action, FN America respectfully requests the opportunity to submit briefing,
18  argument, and additional evidence as necessary to support removal.

19       WHEREFORE, the Moving Defendant FN America removes this action to this Court for
20  further proceedings according to law.

21       Dated this 9th day of July, 2019.

22                    **SPENCER FANE LLP**

23

24                    /s/ Jessica E. Chong
                    John H. Mowbray (NV Bar No. 1140)
25                      Mary E. Bacon (NV Bar No. 12686)
                    Jessica E. Chong (NV Bar No. 13845)
26                      300 S. Fourth Street, Suite 950
                    Las Vegas, NV 89101
27

28                      and

Turner A. Broughton (*Applying Pro Hac Vice*)
tbroughton@williamsmullen.com
Justin S. Feinman (*Applying Pro Hac Vice*)
jfeinman@williamsmullen.com
WILLIAMS MULLEN, PC
200 South 10th Street, 16th Floor
Richmond, VA  23219
Telephone:  804.420.6000

Camden R. Webb (*Applying Pro Hac Vice*)
cwebb@williamsmullen.com
WILLIAMS MULLEN, PC
301 Fayetteville Street, Suite 1700
Raleigh, NC  27601
Telephone: 703.760.5232
*Counsel for FN America*

1

## CERTIFICATE OF SERVICE

2          I certify that a true and correct copy of the foregoing Notice of Removal was served on the

3

following on July 9, 2019 via first class U.S. Mail:

4

5          Matthew L. Sharp, Esq. (Nev. #4746)
          MATTHEW L SHARP, LTD.

6          432 Ridge Street
          Reno, NV 89501

7          (775) 324-1500

8          Richard H. Friedman, Esq. (Nev. #12743)
          FRIEDMAN RUBIN PLLP

9          1126 Highland Avenue
          Bremerton, WA 98337

10         (360) 782-4300

11

12         Joshua D. Koskoff, Esq. (*Applying Pro Hac Vice*)
          Katherine L. Mesner-Hage, Esq. (*Applying Pro Hac Vice*)

13         KOSKOFF, KOSKOFF & BIEDER, PC
          350 Fairfield Avenue

14         Bridgeport, CT 06604
          (203) 336-4421

15                        /s/ ADAM MILLER

16                        AN EMPLOYEE OF SPENCER FANE LLP

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Electronically Filed
7/2/2019 5:53 PM
Steven D. Grierson
CLERK OF THE COURT

1  COMJD
   **MATTHEW L. SHARP, ESQ.**
2  Nevada State Bar No. 4746
   Matthew L. Sharp, Ltd.
3  432 Ridge Street
   Reno, NV 89501
4  (775) 324-1500
   matt@mattsharplaw.com
5
   **RICHARD H. FRIEDMAN, ESQ.**
6  Nevada State Bar No. 12743
   Friedman Rubin PLLP
7  1126 Highland Avenue
   Bremerton, WA  98337
8  (360) 782-4300
   rfriedman@friedmanrubin.com
9
10 **JOSHUA D. KOSKOFF, ESQ.**
   **KATHERINE L. MESNER-HAGE, ESQ.**
11 *(Pro Hac Vice applications to be filed)*
   Koskoff, Koskoff & Bieder, PC
12 350 Fairfield Avenue
   Bridgeport, CT 06604
13 (203) 336-4421
14
15 *Attorneys for Plaintiffs*

CASE NO: A-19-797891-C
Department 22

16                    DISTRICT COURT

17              CLARK COUNTY, NEVADA

18 JAMES PARSONS, individually and as Special        CASE NO.:
   Administrator of the Estate of Carolyn Lee Parsons,
19 and ANN-MARIE PARSONS,                             DEPT. NO.:
20            Plaintiffs,
21 vs.
22 COLT'S MANUFACTURING COMPANY LLC; COLT            **COMPLAINT AND**
23 DEFENSE LLC; DANIEL DEFENSE INC.; PATRIOT         **JURY DEMAND**
   ORDNANCE FACTORY; FN AMERICA; FN
24 HERSTAL; HERSTAL GROUP;  NOVESKE
   RIFLEWORKS LLC; CHRISTENSEN ARMS; LEWIS
25 MACHINE & TOOL COMPANY;  LWRC                      **Exemption Requested:**
   INTERNATIONAL LLC; DISCOUNT FIREARMS              **Damages Exceed $50,000**
26 AND AMMO LLC; DF&A HOLDINGS LLC;                   **Per Plaintiff**
   MAVERICK INVESTMENTS LP; SPORTSMAN'S
27 WAREHOUSE; and GUNS AND GUITARS INC.,
28            Defendants.

                              1

1

## **INTRODUCTION**

2      1.     On February 14, 1929, men associated with notorious gangster Al Capone fired

3   70 rounds from Thompson submachine guns into a Chicago garage, killing seven rival gang

4   members.

5      2.     It was a death toll that would barely register today.  But 1929 was a different

6   time.  The Saint Valentine's Day Massacre, perpetrated with a weapon capable of spraying

7   hundreds of rounds per minute, shocked the nation and galvanized Congress to address the

8   scourge of automatic weapons.

9      3.     The National Firearms Act (NFA) was enacted in 1934 to halt the proliferation

10  of weapons like the so-called "Tommy Gun," which were universally thought to pose an

11  egregious threat to public safety and law enforcement.

12     4.     At congressional hearings, Attorney General Homer Cummings articulated the

13  sentiment shared by Congress, the public, the firearms industry, and the National Rifle

14  Association: "A machine gun, of course, ought never to be in the hands of any private

15  individual. There is not the slightest excuse for it, not the least in the world."

16     5.     The president of the NRA, Karl Frederick, helped Congress draft a definition of

17  "machine gun" that was premised on its essential characteristic – the capacity to produce a

18  ferocious rate of fire unlimited by the shooter's ability to pull the trigger.

19     6.     Colt, at the time the only manufacturer of machine guns, fully cooperated with

20  the government.  The Attorney General reported that Colt had "entered into a gentleman's

21  agreement with the Department of Justice . . . because they have realized what a dreadful thing

22  it has been for those deadly and dangerous weapons to be in the hands of those criminals."

23     7.     That gentleman's agreement was eventually obliterated, along with the firearms

24  industry's concern for public safety.  In the post-Vietnam era, Colt and other firearm

25  manufacturers took the AR-15, the U.S. military's superlative combat rifle, and sold it to

26  civilians with minor changes that preserve the weapon's core design: a machine gun

27  engineered for automatic fire.

28

8.      Congress, together with the Bureau of Alcohol, Tobacco and Firearms (ATF), spent decades adapting the law in order to keep up with the industry and protect the public from automatic weapons.  That effort led to an explicit prohibition on the manufacture and sale of weapons with *design features* that allow for automatic fire through *simple modification*.

9.      Several manufacturers of the AR-15 rifle, including Defendants in this case, were undeterred.   Choosing profits over public safety, Defendants continued to design, manufacture, and market AR-15 rifles that will shoot automatically with modifications that require no technical expertise and can be completed within minutes, if not seconds.

10.     The fact that the AR-15 can be so easily modified is not just known to Defendants; it is intended by them and advertised to potential buyers.

11.     In the last several years alone, scores of Americans have been gunned down indiscriminately with AR-15 rifles in schools, places of worship, night clubs, office parties, movie theaters, and dozens of other places.

12.     America's mass shooters seek fame by death tally.  It has been apparent for years, and reported repeatedly, that even in semi-automatic mode AR-15s are the weapon of choice for shooters looking to inflict maximum casualties.

13.     It was not just possible – or even probable – that a gunman would take advantage of the ease of modifying AR-15s to fire automatically in order to substantially increase the body count during a mass shooting.  It was inevitable.

14.     The inevitable occurred on October 1, 2017.

15.     On that day, eighty-eight years after the St. Valentine's Day Massacre, a man unleashed 1,049 rounds into a crowd of concertgoers in Las Vegas in less than ten minutes, killing 58 and injuring more than 400.

16.     The scale of that crime was made possible by the shooter's arsenal: twelve AR-15 machine guns. Each weapon had been modified with a "bump stock" – an easily installable plastic device that the manufacturers knew would facilitate the weapon's ability to spray automatic fire.

1     17.     Carrie Parsons, aged 31, was killed in Las Vegas while fleeing for her life from

2     a hailstorm of automatic fire.

3     18.     Defendants' willful conduct in designing, manufacturing and marketing these

4     weapons was craven, unconscionable, and flatly illegal under federal and Nevada law.

5                              **PARTIES AND JURISDICTION**

6     19.     Plaintiff James Parsons is a resident of Washington.   He is the Special

7     Administrator of the Estate of Carolyn Lee Parsons.  He is the surviving father of Carolyn Lee

8     Parsons, who was known to her family and friends as Carrie.  Pursuant to NRS 41.085, Mr.

9     Parsons has standing to pursue this claim as the Special Administrator and as an heir to Carrie.

10     20.     Plaintiff Ann-Marie Parsons is a resident of Washington.  She is the surviving

11     mother of Carrie Parsons.  Pursuant to NRS 41.085, she has standing to pursue this claim as an

12     heir to Carrie.

13     21.     Defendant Colt's Manufacturing Company LLC is the manufacturer of the Colt

14     M4 Carbine, an AR-15 style assault rifle that is sold in the United States for personal use.

15     Defendant Colt Defense LLC is the corporate parent of Defendant Colt's Manufacturing

16     Company LLC.

17     22.     Defendant Daniel Defense Inc. is the manufacturer of the Daniel Defense

18     DDM4V11 and the Daniel Defense M4A1, which are both AR-15 style assault rifles that are

19     sold in the United States for personal use.

20     23.     Defendant Patriot Ordnance Factory (POF) is the manufacturer of the POF USA

21     P-15, an AR-15 style assault rifle that is sold in the United States for personal use.

22     24.     Defendant FN Herstal is the manufacturer of the FNH FN15, an AR-15 style

23     assault rifle that is sold in the United States for personal use.  Defendant FN America is the

24     American subsidiary of Defendant FN Herstal.  Defendant Herstal Group is the corporate

25     parent of Defendants FN Herstal and FN America.

26     25.     Defendant Noveske Rifleworks LLC is the manufacturer of the Noveske N4, an

27     AR-15 style assault rifle that is sold in the United States for personal use.

28

26.     Defendant Christensen Arms is the manufacturer of the Christensen Arms CA-15, an AR-15 style assault rifle that is sold in the United States for personal use.

27.     Defendant Lewis Machine & Tool Company (LMT) is the manufacturer of the LMT Defender 2000, an AR-15 style assault rifle that is sold in the United States for personal use.

28.     Defendant LWRC International LLC is the manufacturer of the LWRC M6IC, an AR-15 style assault rifle that is sold in the United States for personal use.

29.     Defendants Colt's Manufacturing Company LLC, Colt Defense LLC, Daniel Defense Inc., Patriot Ordnance Factory, FN Herstal, FN America, Herstal Group, Noveske Rifleworks LLC, Christensen Arms, Lewis Machine & Tool Company, and LWRC International LLC, are hereinafter collectively referred to as "Defendant Manufacturers."

30.     Defendant Discount Firearms & Ammo LLC is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.  Defendant DF&A Holdings LLC is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.  Defendant DF&A Holdings LLC is the manager of Defendant Discount Firearms & Ammo LLC.  Defendant Maverick Investments LP is a Nevada limited partnership with its principal place of business in Las Vegas, Nevada.  Defendant Maverick Investments, LP is the manager of Defendant DF&A Holdings, LLC.

31.     Defendant Guns and Guitars Inc. is a Nevada corporation with its principal place of business in Mesquite, Nevada.

32.     Defendant Sportsman's Warehouse is a Utah corporation with its principal place of business in Midvale, Utah.

33.     Discount Firearms and Ammo LLC, Sportsman's Warehouse, and Guns and Guitars Inc., are hereinafter collectively referred to as "Defendant Dealers."

34.     As alleged herein, the Defendants engaged in illegal and wrongful conduct causing harm in Clark County, Nevada.

**BACKGROUND**

**PART I**
**The Tommy Gun, Al Capone,**
**and a National Consensus on Machine Guns**

35.     The Thompson machine gun, known as the "Tommy gun," was a weapon of war that missed its moment.  It was developed as a military arm during World War I, but the war ended just a few days before the first prototypes were scheduled to be shipped to Europe. Its manufacturer, now in dire financial straits, tried to sell the weapon to the public.

36.     Most Americans had no use for a machine gun.  But the Tommy gun's lethality and light frame made it ideal for a very specific market: Prohibition-era organized crime.

37.     The Tommy gun enabled many of the era's most notorious crimes.  In addition to the Valentines' Day Massacre, it was tied to the 1926 murder of a Chicago prosecutor, William McSwiggin, and the killing of four law enforcement officers in what became known as the "Kansas City Massacre" of 1933.

38.     By 1934, the country had witnessed enough carnage.  Congress stepped in to address what was universally understood to be a serious threat to public safety.

39.     A bill was introduced in the House that sought to impose a 100% tax on the sale of machine guns, putting the total cost at upwards of $7,000 in today's dollars.

40.     During debate, a Republican Representative from Minnesota asked why Congress was not simply banning the sale of machine guns to civilians: "Why should we permit the manufacture, that is, permit the sale of the machine guns to anyone outside of the several branches of the Government – for instance, the Federal Government, the sheriff's officers, and State constabularies?"

41.     The answer was not a lack of political will or public support.  Rather, at the time it was thought that the Constitution's Commerce Clause did not give Congress the authority to pass such a law, forcing Congress to proceed under its taxing power.  The goal was a de facto ban by virtue of making machine guns prohibitively expensive.

42.     In order to draft the law, Congress had to come up with a statutory definition of "machine gun" that identified and captured the weapon's uniquely dangerous character.

43.     In an early iteration of the bill, Congress planned to define a machinegun as "any weapon designed to shoot automatically, or semi-automatically, 12 or more shots without reloading."

44.     Representative Sumners from Texas expressed concern that tying the definition to a particular number of rounds made the law too tempting to evade: "Would you anticipate the possibility, if this bill should be passed, of some unscrupulous manufacturer of these machine guns cutting it down to 11?"

45.     The Attorney General dispelled those concerns, vouching for the industry's — and in particular, Colt's — trustworthiness. "The Colt people have been very cooperative of late and I would not believe for a moment that they would try to evade the law by any such device."

46.     The issue was eventually rendered moot when the president of the NRA, Karl Frederick, proposed a different definition of "machine gun," one that Congress eventually adopted and that endures today: the ability to fire "more than one shot, without manual reloading, by a single function of the trigger."

47.     Tying the definition of automatic fire to the phrase "a single function of the trigger" was intended to clarify that the "essence of a machinegun" (to use Mr. Frederick's words) is the ability to produce a rate of fire that is not limited by how quickly the shooter can pull the trigger.

48.     As Mr. Frederick explained in his testimony:

> Other guns require a separate pull of the trigger for every shot fired, and such guns are not properly designated as machine guns. . . . You must release the trigger and pull it again for the second shot to be fired. You can keep firing that as fast as you can pull the trigger. But that is not properly a machine gun and in point of effectiveness any gun so operated will be very much less effective.

49.     Echoing Representative Sumners, Mr. Frederick also urged Congress to avoid enacting a law with a gaping loophole: "I should not like, if there is to be legislation with respect to machine guns, to have machine guns capable of firing up to 12 shots exempted from the operations of this bill."

7

50.     Persuaded by this testimony, Congress adopted Mr. Frederick's proposal and defined automatic fire accordingly.  The NFA was passed, becoming effective in July of 1934.

51.     In the decades that followed, Representative Sumners' comments proved strikingly prescient.

52.     Beginning in the 1960s, the firearms industry underwent a dramatic shift, shedding the sense of responsibility to the public that had guided its prior cooperation with Congress and choosing instead to embark on a course driven solely by greed.

## PART II
### The AR-15, Vietnam, and the Firearms Industry's Gambit to Profit From "Civilian" Machine Guns

53.     If the Tommy gun was a weapon of war that just missed its moment, the AR-15 was a weapon of war that arrived just in time.

54.     After World War II, the U.S. Army's Operations Research Office (ORO) analyzed over three million casualty reports from World War I, World War II, and the ongoing Korean War.  In its final 1952 report, ORO determined that, in the context of short range, highly mobile combat, the best predictor of casualties was the number of shots fired.  The report also concluded, however, that "current models of fully automatic hand weapons . . . are valueless from the perspective of increasing the number of targets hit."

55.     These findings led the U.S. Army to develop specifications for a new combat weapon: a lightweight firearm that would hold a large detachable magazine, expel ammunition with enough velocity to penetrate body armor and steel helmets, and deliver greater accuracy and lethality in automatic mode than current weaponry.

56.     A company called Armalite designed the AR-15 in response.  Lightweight, air-cooled, gas-operated, and magazine-fed, the AR-15 delivered.  Its core design features enabled fully automatic fire that could be aimed and controlled, while also allowing for semi-automatic and three-round burst firing.  This "selective fire" feature afforded soldiers flexibility to adapt to the exigencies of battle.

57.     Prototypes were completed in time to arm soldiers headed to Vietnam.  Reports of the AR-15's performance as an automatic weapon were glowing.  According to the 1962

8

1  Field Test Report delivered to the Pentagon, an AR-15 in automatic mode was "superior in
2  virtually all respects" to the Thompson or Browning machine guns.

3        58.    The military adopted the AR-15 as its standard-issue rifle, renaming it the M16.

4        59.    One reported example, among many, of the weapon's combat prowess is as
5  follows: "At a distance of approximately 15 meters, one Ranger fired an AR-15 full automatic,
6  hitting one VC [Viet Cong] with three rounds. One round in the head took it completely off.
7  Another in the right arm took it completely off too. One round hit him in the right side,
8  causing a hole about five inches in diameter. It cannot be determined which round killed the
9  VC but it can be assumed that any one of the three would have caused death."

10        60.    The AR-15 was designed and built for this purpose, and this purpose only. It
11  was made for those with the awesome power, and responsibility, to inflict mass casualties in
12  combat. The weapon's superior capacity for lethality, above and beyond other firearms, is why
13  it has endured as the U.S. military's weapon of choice for more than half a century.

14        61.    When the Vietnam War wound down and then ended, military demand naturally
15  declined. Manufacturers responded to this not by manufacturing fewer military weapons, but
16  by seeking to expand the market for military weapons to U.S. civilians.

17        62.    The problem with this plan was that every aspect of the AR-15's design
18  reflected the weapon's raison d'être: to serve as an effective combat weapon capable of fully
19  automatic fire. Transforming it into a truly civilian rifle would have required a different
20  design.

21        63.    But AR-15 manufacturers were not interested in redesign, preferring instead to
22  make the fewest changes possible. This choice was not only cost-effective, it meant
23  manufacturers could use the weapon's close approximation to military weaponry as a selling
24  point.

25        64.    So manufacturers removed the selector switch that allowed the weapon to
26  toggle between automatic, three-round burst, and semi-automatic fire – but otherwise kept the
27  essential design of most internal parts so that they were interchangeable with M16 parts.

28

9

65.   Exterior components like the stock, barrel and rail system were preserved as easily removeable and interchangeable.

66.   The industry refers to these design features as "modularity" – a synonym for "easily modifiable."

67.   Congress tried valiantly to keep up, returning repeatedly to the legislative drafting table to effectuate the purpose of the NFA: to protect the public from automatic weapons.

68.   In 1968, Congress amended and re-codified the NFA as part of the Gun Control Act of 1968.  In doing do, it expanded the definition of "machinegun" in two ways.

69.   First, Congress expanded the definition of a "machinegun" to include machinegun frames and receivers, "conversion kits" that could transform semi-automatic weapons into machineguns, and combinations of machinegun parts when in the possession of a single person.

70.   Congress further expanded the definition of a "machinegun" to include weapons that presently fire semi-automatically but that "can be readily restored to shoot" automatically.

71.   Firearm manufacturers did not heed this clear statement of legislative concern. Selling semi-automatic weapons that could be easily converted into machine guns was too good for business.

72.   Sellers of conversion kits proliferated, and also found ways to skirt the law.

73.   In 1981, the U.S. Attorney General convened a Task Force on Violent Crime, which addressed the ongoing problem of easily convertible semi-automatic weapons.

74.   In its report, the Task Force noted:

Another problem we wish to address is the ease of conversion of semi-automatic guns into more lethal and more strictly regulated fully automatic guns.... Some manufacturers are producing readily available semi-automatic weapons which can easily be converted to fully automatic weapons by simple tool work or the addition of *readily available parts*.  Over an 18-month period, 20 percent of machine guns seized or purchased by the ATF had been converted in this way. [emphasis supplied.]

10

75. In 1982, ATF addressed the problem directly.  It held that the phrase "designed to shoot" automatically in the NFA means "those weapons which have not previously functioned as machineguns but possess design features which facilitate full automatic fire by simple modification or elimination of existing component parts."

76. In other words, a weapon that is manufactured to fire in semi-automatic mode is nevertheless a machinegun if it can be converted to fire automatically through "simple modification."

77. This was a clear directive that responsibility for the scourge of automatic weapons did not lie solely with those selling gadgets or parts that did the work of conversion. By honing-in on the *design features* of semi-automatic weapons, ATF was explicitly calling ut manufacturers for selling easily convertible weapons.

78. In 1986, Congress enacted the Firearms Owners' Protection Act (FOPA) and once again tinkered with the definition of machinegun.

79. Notably, Congress did not eliminate the "designed to shoot" language or otherwise indicate any disagreement with ATF's determination that a weapon with "design features which facilitate full automatic fire by simple modification" is a machinegun.

80. Rather, FOPA once again expanded the definition of the term "machinegun" to address the persistent problem of conversion.  This time, Congress clarified that "any part designed and intended to be used solely and exclusively for converting any weapon into a machinegun" is itself a machinegun under the NFA.

81. Again, Defendant Manufacturers chose to ignore these repeated legislative efforts to address the catastrophic danger posed by easily modifiable weapons.

### PART III
### Modifications, Bump Stocks,
### and the "Full Auto Experience"

82. Since 1986, the AR-15 has found an enthusiastic audience among those interested in owning a thinly disguised machine gun.

83. Hundreds of videos available online show the AR-15 being shot automatically in back yards and at shooting ranges with a shoe string, a rubber band, or with no tools at all.

84.     One YouTube video, viewed more than a million times, shows a man "bump firing" an AR-15 automatically by using only his shoulder to reset the stock and achieve constant trigger activation.

85.     These simple hacks make clear that the AR-15 has never strayed from its roots. It has always been, and remains, a machine gun.

86.     Over the last decade, devices have been developed that capitalize on the AR-15's powerful recoil and removeable stock to make it even easier to generate reliable and continuous automatic fire.

87.     These devices, known generically as "bump stocks," replace the stock of the AR-15 and use the weapon's recoil mechanism to continually fire.

88.     An AR-15 modified with a bump stock will continually fire rounds after a single trigger pull, replicating the automatic fire it was designed for.

89.     Indeed, an AR-15 modified with a bump stock will not continually fire rounds _unless_ the shooter's trigger finger is immobilized.

90.     The Akins Accelerator – an early iteration of the bump stock that came on the market in 2006 – stated in its patent application: "The method of the present invention operates by depressing the trigger with a shooter's trigger finger in order to discharge the firearm. The shooter's finger is then immobilized in the position it has assumed to discharge the firearm."

91.     The Akins Accelerator was recalled after ATF found it was a machinegun.  This did not deter Mr. Akins, who made one (non-functional) modification and put the device back on the market.  The company with whom Mr. Akins partnered sold it online with the following description:

> Ever wonder what it would feel like to own a Machine Gun? Heck Yeah, who doesn't. . . . Well FosTech Outdoors has you covered. The Bumpski is the civilian legal way to convert your semi-auto rifle to bump firing, lead throwing, brass spitting rifle that you have always dreamed of owning. Simply replace your existing stock with the FosTech kit that matches your rifle and away you go.

92.     Despite the fact that bump stocks like the Akins Accelerator unequivocally converted AR-15s into fully automatic machine guns, the Defendant Manufacturers did

nothing to change the design features of the weapon that rendered it susceptible to simple modification.

93.     In 2010, a bump stock from a company called Slide Fire came on the market.

94.     Like the Akins Accelerator, the Slide Fire bump stock replaced the AR-15's stock and allowed the shooter to cycle fire with a single trigger pull.  As the Slide Fire website advised customers having trouble with the device: "Make sure your finger is tightly seated on the finger rest and that it does not move while you are shooting your firearm. After years of shooting by moving your finger, it can be a hard habit to break."

95.     But Slide Fire also "improved" upon the Akins Accelerator.  It could be installed in much less time with nothing more than a screwdriver and was compatible with a greater number of AR-15 brands.

96.     The inventor of Slide Fire, Jeremiah Cottle, stated in an interview that he developed the bump stock because he "love[s] full auto."

97.     Mr. Cottle said of his invention: "Slide Fire brings shooters the same full auto experience" as a fully automatic firearm.

98.     For several years prior to 2017, this "full auto experience" could be had by any AR-15 with access to the internet and a few minutes to spare.

99.     The simple steps necessary to remove the stocks of Defendant Manufacturers' AR-15s and replace them with a bump stock or similar device can be learned from dozens of videos readily accessible on the internet.

100.    Defendant Manufacturers, with full knowledge of the market for automatic weapons and the availability of bump stocks and similar devices, continued to manufacture their respective AR-15 rifles so that the stock could be easily removed and replaced with a bump stock.

101.    Moreover, with a reckless lack of regard for public safety, Defendant Manufacturers courted buyers by advertising their AR-15s as military weapons and signaling the weapon's ability to be simply modified.

102.   Defendants made these choices despite a decade's worth of evidence – including the *more than one hundred* deaths at Sandy Hook, Aurora, San Bernardino, and Orlando alone – proving that AR-15s were the weapon of choice for mass shooters looking to inflict maximum casualties.

103.   It was only a question of when – not if – a gunman would take advantage of the ease of modifying AR-15s to fire automatically in order to substantially increase the body count during a mass shooting.

104.   Having created the conditions that made a mass shooting with a modified AR-15 inevitable, Defendant Manufacturers continued conducting business as usual.

## PART IV
### The Road to Las Vegas

105.   On November 23, 2016, Steven Paddock ("the shooter") purchased a Daniel Defense M4V11 AR-15, serial number DDM4078072.

106.   The Daniel Defense DDM4V11 is advertised as "Mil-Spec" [shorthand for military specifications], comes equipped with a "Daniel Defense Flash Suppressor," and is touted as allowing the shooter "to drive the gun more precisely and prevent over travel when transitioning between multiple targets," as well as allowing for "quick but precise rapid fire."

107.   Daniel Defense allows customers to order an AR-15 that is completely customized to their specifications.  Its website has a section entitled "Build a Complete Rifle," which walks the customer through each part and the various options, emphasizing repeatedly the weapon's military bona fides.  When selecting for gas system length, for example, the "Carbine Length" option reads: "Built for combat reliability in all conditions, the carbine length is the military standard for the M4 Carbine."

108.   On January 25, 2017, the shooter purchased a POF USA P15 AR-15, serial number PE-1600179.

109.   POF USA, a company for "Fire-Breathing Patriots," calls its "modular" AR-15s "the Ultimate Fighting Machines that just won't quit," engineered "to withstand the most rugged environments."

110.    On February 2, 2017, the shooter purchased a FNH FN15 AR-15, serial number FNB024293.

111.    FNH was originally known as Fabrique Nationale d'Armes de Guerre – French for National Factory of Weapons of War.  A Belgium company, it is famous for collaborating with John Browning on early automatic weapons, manufacturing one of the firearms confiscated from Archduke Ferdinand's assassins, and more recently, selling arms and ammunition to Gaddafi's regime in Libya.  The FN 15, available to civilians in the U.S., is "built to withstand the varied and unrelentingly harsh conditions of battlefields around the world."

112.    On February 15, 2017, the shooter purchased another Daniel Defense AR-15, the M4A1, serial number DDM4123629.

113.    The Daniel Defense M4A1, also "Mil-Spec," is advertised as having a Rail Interface System "which has been in use by US Special Operations Command."

114.    On February 18, 2017, the shooter purchased a Noveske N4 AR-15, serial number B15993.

115.    Noveske touts its AR-15s as "built to mil-specs" and notes that its parts "should interchange with other mil-spec components."

116.    On March 2, 2017, the shooter purchased three weapons in the same day:  a Colt M4 AR-15, serial number LE564124; a LMT Defender 2000, serial number LMT81745; and a Christensen Arms CA-15 AR-15, serial number CA04625.

117.    Colt advertises its M4 Carbine as having the "reliability, performance, and accuracy" that "provide[s] our Armed Forces the confidence required to accomplish any mission."  The M4 Carbine "shares many features of its combat-proven brother, the Colt M4."

118.    Colt has a "Custom Shop" where customers can build the rifle of their choosing "from many custom options."

119.    The bump stock manufacturer, Slide Fire, specifically advertised the bump stock's compatibility with the Colt AR-15 platform using the Colt trademark.

120.   In August of 2016, as a result of an agreement between Slide Fire and Colt, a Colt Competition AR-15 was sold with a Slide Fire bump stock already "integrated."[1]

121.   LMT was founded "to provide the US Military, law enforcement and government agencies with precision engineered, high quality weapons, components and modular weapon systems."  The Defender 2000, available to civilians, was "the progenitor of the many customization options" LMT now offers.

122.   In 2014, LMT announced a new stock that was "designed to be able to replace current adjustable stocks in less than twenty seconds with no special tools."

123.   Christensen Arms not only touts its AR-15's "mil-spec" platform, it explicitly acknowledges the weapon's capability for automatic fire.  Its AR-15 user manual notes that "any damage or malfunction due to fully automatic operation and any other modification to this firearm" voids the company's warranties.

124.   On May 25, 2017, the shooter purchased another Colt M4 AR-15, serial number LE451984.

125.   On June 30, 2017, the shooter purchased two weapons:  a second POF USA P15 AR-15, serial number 03E-1603178; and a second FNH FN15 AR-15, serial number FNCR000383.

126.   On either May 5, 2017 or July 5, 2017, the shooter purchased a LWRC M6IC AR-15, serial number 5P03902.

127.   LWRC developed the "IC" rifle series to compete in the U.S. Army's Individual Carbine Program, a competition to select the Army's next standard-issue combat weapon.  The competition was cancelled, but LWRC wasted no time making the weapon available to the public.  Advertising boasts that the M6IC is "directly descended from the rifles developed by LWRCI to meet the requirements of the U.S. Army Individual Carbine Program" and are "available in a wide variety of configurations to meet any need or requirement."

---

[1] The shooter purchased a Colt Competition AR-15 on May 25, 2017 and brought it to his suite at Mandalay Bay, but did not fire it on October 1.

128.    At some time prior to October 1, 2017, the shooter purchased more than a dozen bump stocks.

129.    Every AR-15 in the shooter's arsenal was compatible with the bump stocks.

130.    At some time prior to October 1, 2017, the shooter purchased dozens of high-capacity magazines, including 100-round magazines.

131.    In the days leading up to October 1, 2017, more than 20,000 people converged on Las Vegas for the annual Route 91 Harvest Musical Festival, held at the Las Vegas Village.

132.    One of those people was Carrie Parsons, aged 31.

133.    Carrie was in Las Vegas to spend a girls' weekend with friends on her way home to Seattle after a business trip.  Carrie loved country music, almost as much as she loved her hometown sports teams, the Seahawks and the Mariners.

134.    A graduate of Arizona State University, Carrie was working at a staffing agency in downtown Seattle – a job that had sent her to New York the week before the music festival.

135.    Carrie had recently become engaged and by October 1 was in full wedding-planning mode.  She had already selected her bridal bouquet.  After the stopover in Vegas, Carrie had plans to spend the weekend with her sister visiting venues and discussing wedding plans.

136.    On October 1, Carrie and her friend, Kelly, arrived at Las Vegas Village well before the concert was set to begin in order to secure spots close to the stage.

137.    Meanwhile, at some point prior to 10:00 PM on October 1, the shooter removed the stocks of the Christensen Arms CA-15, the two Colt M4 carbines, the Daniel Defense M4A1 and M4V11, the two FNH FN15s, the LMT Defender 2000, the LWRC M6IC, the Noveske N4, and the two POF USA P15s, and installed bump stocks in their place.

138.    Replacing the stocks of all twelve AR-15s with bump stocks would likely have taken the shooter no more than 15 minutes.

139.    The shooter attached 100-round magazines to the Christensen Arms CA-15, the two Colt M4 Carbines, the Daniel Defense M4A1 and M4V11, the two FNH FN15s, the LMT Defender 2000, the LWRC M6IC, and the two POF USA P15s.

17

1   140.   The shooter attached a 40-round magazine to the Noveske N4.

2   141.   The shooter's arsenal in his Mandalay Bay hotel suites also included several

3   AR-10s and a revolver.

4   142.   The shooter used one or more of the AR-10s for the sole purpose of firing eight

5   rounds at a fuel tank bordering the Las Vegas Village.

6   143.   The shooter used the revolver to kill himself.

7   144.   The shooter used Defendant Manufacturers' AR-15 machine guns, and _only_

8   Defendant Manufacturers' AR-15 machine guns, to fire at, kill, maim, wound, and terrorize the

9   thousands of innocent civilians gathered below for the concert.

10   145.   At approximately 10:05 PM, the shooter began using Defendant Manufacturers'

11   AR-15 machine guns to fire from 32 stories above ground, through a hole in the window of his

12   hotel suite, at the crowd some 300 yards away.

13   146.   At such a distance, and without sophisticated scopes, precise aim would have

14   been nearly impossible.  The ferocious firepower enabled by Defendant Manufacturers' AR-15

15   machine guns made aim unnecessary.

16   147.   When the first shots were fired, most people assumed they were fireworks.

17   Carrie's friend, Kelly, who happened to be reading a book where a character initially thinks

18   gunfire is fireworks, was alarmed.  She grabbed Carrie and told her they needed to leave.

19   148.   Carrie and Kelly, holding hands to avoid being separated, wove through the

20   crowd toward the bleachers along the side of the Village.  They exited the venue and ran

21   through a large parking lot to an adjacent street.

22   149.   Carrie and Kelly encountered two fences as they tried to escape.  One was

23   knocked down by the force of the crowd.  They were able to climb over the other.

24   150.   As Kelly and Carrie ran, the shooter moved through his arsenal, unleashing

25   automatic fire from each of Defendant Manufacturers' AR-15 machine guns.

26   151.   21 rounds were fired automatically from the Christensen Arms CA-15, serial

27   number CA04625.

28

152.    100 rounds were fired automatically from the Colt M4 Carbine, serial number LE451984.

153.    96 rounds were fired automatically from the Colt M4 Carbine, serial number LE564124.

154.    95 rounds were fired automatically from the Daniel Defense M4A1, serial number DDM4123629.

155.    100 rounds were fired automatically from the Daniel Defense M4V11, serial number DDM4078072.

156.    144 rounds were fired automatically from the FNH FN15, serial number FNCR000383.

157.    153 rounds were fired automatically from the FNH FN15, serial number FNB024293.

158.    100 rounds were fired automatically from the LMT Defender 2000, serial number LMT81745.

159.    12 rounds were fired automatically from the LWRC M6IC, serial number 5P03902.

160.    33 rounds were fired automatically from the Noveske N4, serial number B15993.

161.    95 rounds were fired automatically from the POF USA P15, serial number PE-1600179.

162.    100 rounds were fired automatically from the POF USA P15, serial number 03E-1603178.

163.    In total, 1049 rounds were fired from Defendant Manufacturers' AR-15 machine guns in less than ten minutes.

164.    Though they didn't know the source of the gun fire, Carrie and Kelly ran away from Mandalay Bay, further from the shooter.

165.    As they approached the street, where an ambulance was already parked, Carrie was shot from behind in the shoulder.

19

166.   Carrie was able to keep running until they reached the ambulance. The ambulance rushed her to a nearby hospital, but it was too late.

167.   Carrie did not survive her wound.

168.   From hundreds of yards away and 32 stories above ground, Defendant Manufacturers' AR-15 machine guns proved as lethal as they were in Vietnam.

169.   Due to the high number of casualties, it was several days before Carrie's body could be identified. Later that week, Jim and Ann-Marie brought their daughter home.

170.   On the day Carrie was supposed to visit wedding venues, she was buried with the bouquet she had chosen to carry down the aisle.

## COUNT ONE

### NRS 41.085 Action for Death by Wrongful Act

1-170.   Plaintiffs incorporate the allegations of paragraphs 1 through 170 as if fully set forth herein.

171.   Defendants knew, or should have known, of the facts alleged at paragraphs 1 through 170.

172.   Pursuant to 18 U.S.C. § 922(b)(4), it is illegal for any licensed importer, licensed manufacturer, or licensed dealer to sell or deliver a machine gun to any individual, corporation or company.

173.   Pursuant to NRS 202.350(1)(b), it is illegal for any person to manufacture or cause to be manufactured, or import into the State of Nevada, or keep, offer or expose for sale, or give, lend, possess or use a machine gun.

174.   A weapon that shoots more than one round with a single pull of the trigger is a machine gun.

175.   A weapon that possesses design features which facilitate full automatic fire by simple modification or elimination of component parts is a machine gun.

176.   The AR-15s identified in this Complaint possessed design features that allowed them to be shot automatically without any modifications.

177.    The AR-15s identified in this Complaint possessed design features that allowed internal parts to be easily swapped out for M16 and/or M4 parts.

178.    The AR-15s identified in this Complaint possessed design features that allowed them to be shot automatically with simple modifications involving common household items.

179.    The AR-15s identified in this Complaint possessed design features, including an easily removable stock, that allowed modification with a bump stock without any special tools and in less than five minutes.

180.    The AR-15s identified in this Complaint, after modification with a bump stock, allow a shooter to initiate a continuous firing cycle with a single pull of the trigger; in other words, to fire automatically.

181.    Defendants have known for years that their AR-15s could be easily modified to fire automatically.

182.    Defendants have known of the existence and availability of bump stock devices since at least 2006, when the Akins Accelerator came on the market.

183.    Defendants have known of the existence and availability of the Slide Fire bump stock since 2010.

184.    Christensen Arms knowingly designed the CA-15 with an easily removable stock and chose design features that made the CA-15 capable of automatic fire through simple modification.

185.    Colt knowingly designed the M4 Carbine with an easily removable stock and chose design features that made the M4 Carbine capable of automatic fire through simple modification.

186.    Daniel Defense knowingly designed the M4A1 and the M4V11 with an easily removable stock and chose design features that made the M4A1 and the M4V11 capable of automatic fire through simple modification.

187.    FNH knowingly designed the FN15 with an easily removable stock and chose design features that made the FN15 capable of automatic fire through simple modification.

188.   LMT knowingly designed the Defender 2000 with an easily removable stock and chose design features that made the Defender 2000 capable of automatic fire through simple modification.

189.   LWRC knowingly designed the M6IC with an easily removable stock and chose design features that made the M6IC capable of automatic fire through simple modification.

190.   Noveske knowingly designed the N4 with an easily removable stock and chose design features that made the N4 capable of automatic fire through simple modification.

191.   POF USA knowingly designed the P15 with an easily removable stock and chose design features that made the P15 capable of automatic fire through simple modification.

192.   Defendant Manufacturers' conduct as alleged above was wrongful and in knowing violation of 18 U.S.C. § 922(b)(4) and NRS 202.350(1)(b).

193.   Discount Firearms and Ammo knowingly made one of Defendant Manufacturers' AR-15 machine guns available for sale and sold it to the shooter despite knowledge that it possessed design features which facilitate full automatic fire by simple modification.

194.   Sportsman's Warehouse knowingly made four of Defendant Manufacturers' AR-15 machine guns available for sale and sold them to the shooter despite knowledge that they possessed design features which facilitate full automatic fire by simple modification.

195.   Guns and Guitars made one of Defendant Manufacturers' AR-15 machine guns available for sale and sold it to the shooter despite knowledge that it possessed design features which facilitate full automatic fire by simple modification.

196.   Defendant Dealers' conduct as alleged above was wrongful and in knowing violation of 18 U.S.C. § 922(b)(4) and NRS 202.350(1)(b).

197.   The sequential use of all twelve AR-15 machine guns modified with bumps stocks created a torrent of continuous automatic fire that amplified the lethality and rapidity of the assault and increased the risk that Carrie Parsons would be shot and seriously injured or killed and was thus a substantial factor in causing her death.

198.    The Defendants' conduct in violation of 18 U.S.C. § 922(b)(4) and NRS 202.350(1)(b) exposed Carrie Parsons to an unreasonable risk of harm.

199.    One of Defendants' AR-15 machine guns fired the shot that killed Carrie Parsons.

200.    It is not known at this time which of Defendants' AR-15 machine guns fired the shot that killed Carrie Parsons.

201.    To the extent that information cannot be proved by plaintiffs, the burden should shift to Defendant Manufacturers to prove, if they can, which weapon fired the shot that killed Carrie Parsons, because all Defendants engaged in illegal conduct that contributed to the harm on October 1, 2017.

202.    The events of October 1 would not have occurred but for the Defendants' illegal and wrongful conduct.

203.    Each of the Defendants' conduct in violation of 18 U.S.C. § 922(b)(4) and NRS 202.350(1)(b) was a proximate cause of the injuries and death of Carrie Parsons.

204.    Plaintiff James Parsons, as the Special Administrator of the Estate, has and is incurring damages as specified in NRS 41.085(5) and the damages Carrie Parsons would have recovered had she lived pursuant to NRS 41.100(3) in an amount to be determined at trial and in excess of $15,000.

205.    As heirs of Carrie Parsons, Plaintiffs James Parsons and Ann-Marie Parsons have and are incurring damages for their own grief, sorrow, loss of probable support, companionship, society, and comfort in an amount to be determined at trial and in excess of $15,000.

206.    In engaging in the conduct described herein, Defendants have acted with fraud, malice and oppression, entitling plaintiffs to punitive damages in an amount determined by the jury, but in any event, in excess of $15,000.

207.    Plaintiff James Parsons, as the Special Administrator of the Estate, may recover punitive damages pursuant to NRS 41.085(5) and NRS 41.100(3).

## COUNT TWO

### (Negligence Per Se)

1-170.   Plaintiffs incorporate the allegations of paragraphs 1 through 170 as if fully set forth herein.

171-203. Plaintiffs incorporate the allegations of paragraphs 171 through 203 of Count One as if fully set forth herein.

204.   18 U.S.C. § 922(b)(4) and NRS 202.350(1)(b) are intended to protect members of the public from physical injury and death caused by machine guns.

205.   Carrie Parsons is a member of the class of persons that 18 U.S.C. § 922(b)(4) and NRS 202.350(1)(b) were intended to protect.

206.   Carrie Parsons suffered the type of injury that 18 U.S.C. § 922 and NRS 202.350(1)(b) were intended to prevent.

207.   The Defendants are liable to plaintiffs in negligence per se for selling weapons that were designed to shoot automatically, which proximately caused the injures and death of Carrie Parsons.

208.   Plaintiff James Parsons, as the Special Administrator of the Estate, has and is incurring damages as specified in NRS 41.085(5) and the damages Carrie Parsons would have recovered had she lived pursuant to NRS 41.100(3) in an amount to be determined at trial and in excess of $15,000.

209.   As heirs of Carrie Parsons, Plaintiffs James Parsons and Ann-Marie Parsons have and are incurring damages for their own grief, sorrow, loss of probable support, companionship, society, and comfort in an amount to be determined at trial and in excess of $15,000.

210.   In engaging in the conduct described herein, Defendants have acted with fraud, malice and oppression, entitling plaintiffs to punitive damages in an amount determined by the jury, but in any event, in excess of $15,000.

211.   Plaintiff James Parsons, as the Special Administrator of the Estate, may recover punitive damages pursuant to NRS 41.085(5) and NRS 41.100(3).

24

**COUNT THREE**

**(Negligent Entrustment)**

1-170.  Plaintiffs incorporate the allegations of paragraphs 1 through 170 as if fully set forth herein.

171-203. Plaintiffs incorporate the allegations of paragraphs 171 through 203 of Count One as if fully set forth herein.

204.  The Defendants knew, or should have known, of all the foregoing information alleged.  Based on this and similar information, the Defendants knew, or should have known, that the sale of their easily modifiable AR-15s posed an unreasonable and egregious risk of physical injury to others.

205.  A mass casualty event, such as the shooting at Las Vegas Village on October 1, 2017, was within the scope of the risk created by the Defendant Manufacturers' design, marketing and sale of their AR-15 rifles.

206.  A mass casualty event, such as the shooting at Las Vegas Village on October 1, 2017, was within the scope of the risk created by the Defendant Dealers' sale of the Defendant Manufacturers' AR-15 rifles.

207.  The Defendants, as those who deal in firearms, are required to exercise the closest attention and the most careful precautions in the conduct of their business.

208.  The Defendant Manufacturers' sale of the Christensen Arms CA-15, serial number CA04625; the Colt M4 Carbine, serial number LE451984; the Colt M4 Carbine, serial number LE564124; the Daniel Defense M4A1, serial number DDM4123629; the Daniel Defense M4V11, serial number DDM4078072; the FNH FN15, serial number FNCR000383; the FNH FN15, serial number FNB024293; the LMT Defender 2000, serial number LMT81745; the LWRC M6IC, serial number 5P03902; the Noveske N4, serial number B15993; the POF USA P15, serial number PE-1600179; and the POF USA P15, serial number 03E-1603178 constituted entrustments that posed an unreasonable risk of physical harm to others, including the victims of a foreseeable mass shooting event perpetrated with simply modified AR-15s capable of automatic fire.

25

209. Discount Firearms and Ammo's sale of one of Defendant Manufacturers' AR-15s to the shooter constituted an entrustment that posed an unreasonable risk of physical harm to others, including the victims of a foreseeable mass shooting event perpetrated with simply modified AR-15s capable of automatic fire.

210. Sportsman's Warehouse's sale of four of Defendant Manufacturers' AR-15s to the shooter – including three on a single day – constituted an entrustment that posed an unreasonable risk of physical harm to others, including the victims of a foreseeable mass shooting event perpetrated with simply modified AR-15s capable of automatic fire.

211. Guns and Guitars' sale of one of Defendant Manufacturers' AR-15s constituted an entrustment that posed an unreasonable risk of physical harm to others, including the victims of a foreseeable mass shooting event perpetrated with simply modified AR-15s capable of automatic fire.

212. Plaintiff James Parsons, as the Special Administrator of the Estate, has and is incurring damages as specified in NRS 41.085(5) and the damages Carrie Parsons would have recovered had she lived pursuant to NRS 41.100(3) in an amount to be determined at trial and in excess of $15,000.

213. As heirs of Carrie Parsons, Plaintiffs James Parsons and Ann-Marie Parsons have and are incurring damages for their own grief, sorrow, loss of probable support, companionship, society, and comfort in an amount to be determined at trial and in excess of $15,000.

214. In engaging in the conduct described herein, Defendants have acted with fraud, malice and oppression, entitling plaintiffs to punitive damages in an amount determined by the jury, but in any event, in excess of $15,000.

215. Plaintiff James Parsons, as the Special Administrator of the Estate, may recover punitive damages pursuant to NRS 41.085(5) and NRS 41.100(3).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1. Special, general and punitive damages, according to proof but in excess of Fifteen Thousand Dollars ($15,000.00);

26

1    2.    Pre- and post-judgment interest as provided by law;

2    3.    An award of attorney's fees and costs of suit incurred; and

3    4.    For such other and further relief as the Court deems just and proper.

4    **AFFIRMATION**

5         The undersigned does hereby affirm that the preceding document does not

6    contain the Social Security number of any person.

7         DATED this 2nd day of July 2019.

8         MATTHEW L. SHARP, LTD.

9         /s/ *Matthew L. Sharp*

10        Matthew L. Sharp
          Nevada State Bar No. 4746

11        432 Ridge Street
          Reno, NV 89501

12        (775) 324-1500

13        **JURY TRIAL DEMAND**

14        Plaintiffs hereby demand trial by jury of all issues so triable.

15        MATTHEW L. SHARP, LTD.

16        /s/ *Matthew L. Sharp*

17        Matthew L. Sharp
          Nevada State Bar No. 4746

18        432 Ridge Street
          Reno, NV 89501

19        (775) 324-1500

20        Richard H. Friedman
          Nevada State Bar No. 12743

21        Friedman Rubin PLLP
          1126 Highland Avenue

22        Bremerton, WA  98337
          (360) 782-4300

23
          Joshua D. Koskoff,
24        *Pro Hac Vice to be filed*
          Katherine L. Mesner-Hage,
25        *Pro Hac Vice to be filed*
          Koskoff, Koskoff & Bieder, P.C.
26        350 Fairfield Avenue
          Bridgeport, CT 06604
27        (203) 336-4421

28        *Attorneys for Plaintiffs*

27

# EXHIBIT B

Electronically Filed
7/2/2019 5:53 PM
Steven D. Grierson
CLERK OF THE COURT

1

**IAFD**
**MATTHEW L. SHARP, ESQ.**

2   Nevada State Bar No. 4746
Matthew L. Sharp, Ltd.

3   432 Ridge Street
Reno, NV 89501

4   (775) 324-1500
matt@mattsharplaw.com

5

CASE NO: A-19-797891-C
Department 22

6

DISTRICT COURT

7

CLARK COUNTY, NEVADA

8   JAMES PARSONS, individually and.
as Special Administrator of the Estate

9   of Carolyn Lee Parsons, and
ANN-MARIE PARSONS,

10

CASE NO. _____

11           Plaintiff(s),

DEPT. NO. _____

12           -vs-

13   COLT'S MANUFACTURING
COMPANY LLC, COLT DEFENSE

14   LLC, DANIEL DEFENSE INC, PATRIOT
ORDNANCE FACTORY, FN AMERICA,

15   FN HERSTAL, HERSTAL GROUP,
NOVESKE RIFLEWORKS LLC,

16   CHRISTENSEN ARMS, LEWIS
MACHINE & TOOL COMPANY, LWRC

17   INTERNATIONAL LLC, DISCOUNT
FIREARMS AND AMMO LLC, DF&A

18   HOLDINGS LLC, MAVERICK
INVESTMENTS LP, SPORTSMAN'S

19   WAREHOUSE, and GUNS AND
GUITARS INC.,

20

21           Defendant(s).

22

23   **INITIAL APPEARANCE FEE DISCLOSURE (NRS CHAPTER 19)**

24           Pursuant to NRS Chapter 19, as amended by Senate Bill 106, filing fees are

25   submitted for parties appearing in the above entitled action as indicated below:

26

27   ////

28   ////

Initial Appearance Fee Disclosure/7/2/2019

| New Complaint Fee | 1st Appearance Fee |
|---|---|
| ☐ $1530 ☐ $520 ☐ $299 ☒ $270.00 | ☐ $1483.00 ☐ $473.00 ☐ $223.00 |

| Name: | |
|---|---|
| James Parsons, individually | |
| James Parsons as Special Administrator of the Estate of Carolyn Lee Parsons | ☒ $30 |
| Ann-Marie Parsons | ☒ $30 |
| | ☐ $30 |
| | ☐ $30 |
| ☐ Total of Continuation Sheet Attached | ☐ $_____ |

TOTAL REMITTED: (Required)                    Total Paid          $ 330.00

DATED this 2nd day of July 2019.

/s/ Matthew L. Sharp
_____
**MATTHEW L. SHARP, ESQ.**
Nevada State Bar No. 4746
Matthew L. Sharp, Ltd.
432 Ridge Street
Reno, NV 89501
(775) 324-1500
matt@mattsharplaw.com

# EXHIBIT C

Skip to Main Content  Logout  My Account  Search Menu  New District Civil/Criminal Search  Refine Search  Back   Location : District Court Civil/Criminal    Help

# REGISTER OF ACTIONS
## CASE NO. A-19-797891-C

| James Parsons, Plaintiff(s) vs. Colt's Manufacturing Company LLC, Defendant(s) | § § § § § § | | Case Type: | Negligence - Other Negligence |
|---|---|---|---|---|
| | | | Date Filed: | 07/02/2019 |
| | | | Location: | Department 22 |
| | | | Cross-Reference Case Number: | A797891 |

---

### PARTY INFORMATION

| | | Lead Attorneys |
|---|---|---|
| Defendant | Christensen Arms | |
| Defendant | Colt Defense LLC | |
| Defendant | Colt's Manufacturing Company LLC | |
| Defendant | Daniel Defense Inc. | |
| Defendant | DF&A Holdings LLC | |
| Defendant | Discount Firearms and Ammo LLC | |
| Defendant | FN America | |
| Defendant | FN Herstal | |
| Defendant | Guns and Guitars Inc. | |
| Defendant | Herstal Group | |
| Defendant | Lewis Machine & Tool Company | |
| Defendant | LWRC International LLC | |
| Defendant | Maverick Investments LP | |
| Defendant | Noveske Rifleworks LLC | |
| Defendant | Patriot Ordnance Factory | |
| Defendant | Sportsman's Warehouse | |
| Plaintiff | Estate of Carolyn Lee Parsons | Matthew L. Sharp *Retained* 7023226636(W) |
| Plaintiff | Parsons, Ann-Marie | Matthew L. Sharp *Retained* 7023226636(W) |
| Plaintiff | Parsons, James | Matthew L. Sharp *Retained* 7023226636(W) |

---

### EVENTS & ORDERS OF THE COURT

OTHER EVENTS AND HEARINGS

| | |
|---|---|
| 07/02/2019 | **Complaint With Jury Demand** |
| | *Complaint and Jury Demand* |
| 07/02/2019 | **Initial Appearance Fee Disclosure** |
| | *Initial Appearance Fee Disclosure* |
| 07/02/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Civil* |
| 07/02/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Civil* |
| 07/02/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Civil* |
| 07/02/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Civil* |
| 07/02/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Civil* |
| 07/02/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Civil* |
| 07/02/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Civil* |
| 07/02/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Civil* |
| 07/02/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Civil* |
| 07/02/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Civil* |
| 07/02/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Civil* |
| 07/02/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Civil* |
| 07/02/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Civil* |
| 07/02/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Civil* |
| 07/02/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Civil* |
| 07/02/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Civil* |
| 07/03/2019 | **Summons Electronically Issued - Service Pending** |
| | *Summons - Christensen Arms* |

---

### FINANCIAL INFORMATION

| | | | | |
|---|---|---|---|---|
| | **Administrator** Parsons, James | | | |
| | Total Financial Assessment | | | 330.00 |
| | Total Payments and Credits | | | 270.00 |
| | **Balance Due as of 07/09/2019** | | | 60.00 |
| 07/03/2019 | Transaction Assessment | | | 270.00 |
| 07/03/2019 | Efile Payment | Receipt # 2019-40674-CCCLK | Parsons, James | (270.00) |
| 07/05/2019 | Transaction Assessment | | | 60.00 |