John F. Renzulli (*Pro Hac Vice*)
jrenzulli@renzullilaw.com
Christopher Renzulli (*Pro Hac Vice*)
crenzulli@renzullilaw.com
Scott C. Allan (*Pro Hac Vice*)
sallan@renzullilaw.com
Renzulli Law Firm, LLP
One North Broadway, Suite 1005
White Plains, NY
Telephone: (914) 285-0700
Facsimile:  (914) 285-1213

Counsel for Defendants Colt's Manufacturing Company, LLC, Colt Defense, LLC, Lewis Machine & Tool Company, and LWRC International, LLC

[Counsel for additional defendants identified on the signature pages]

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JAMES PARSONS, individually and as Special Administrator of the Estate of Carolyn Lee Parsons, and ANN-MARIE PARSONS,

Plaintiffs**,**

v.

COLT'S MANUFACTURING COMPANY LLC, LLC; COLT DEFENSE LLC; DANIEL DEFENSE INC.; PATRIOT ORDNANCE FACTORY; FN AMERICA; FN HERSTAL; HERSTAL GROUP; NOVESKE RIFLEWORKS LLC; CHRISTENSEN ARMS; LEWIS MACHINE & TOOL COMPANY; LWRC INTERNATIONAL LLC; DISCOUNT FIREARMS AND AMMO LLC; DF&A HOLDINGS LLC; MAVERICK INVESTMENTS LP; SPORTSMAN'S WAREHOUSE; and GUNS AND GUITARS INC.

Defendants.

**Case No. 2:19-CV-01189-APG-EJY**

**DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

Defendants Colt's Manufacturing Company LLC, Colt's Defense LLC, Daniel Defense, Inc., Patriot Ordnance Factory, Inc., FN America, LLC, Noveske Rifle Works LLC, Christensen Arms, Lewis Machine & Tool Company, and LWRC International LLC (collectively "Defendant Manufacturers"), and Discount Guns & Ammo, DF&A Holdings LLC, Maverick Investments LP, Guns & Guitars, Inc., and Sportsman's Warehouse, Inc. (collectively "Defendant Sellers") respectfully move to dismiss Plaintiffs' Complaint with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Protection of Lawful Commerce in Arms Act, 15 U.S.C. §§ 7901-03 ("PLCAA" or the "Act"), Nevada Revised Statute § 41.131, and principles of causation.

## MEMORANDUM OF POINTS AND AUTHORITIES

## SUMMARY OF THE ARGUMENT

The October 1, 2017 shooting at the Route 91 Harvest Music Festival was a tragedy, but Defendants – manufacturers and retailers of rifles allegedly used by the shooter ("Subject Rifles") – are not responsible for the deaths and injuries the shooter caused.  In fact, Plaintiffs' lawsuit, which seeks to hold Defendants liable for damages caused by the intentional crimes of the shooter, is expressly barred by the PLCAA.  The PLCAA prohibits claims against firearm manufacturers or sellers for damages resulting from a third party's criminal or unlawful misuse of a firearm, subject to six limited exceptions.  Plaintiffs' Complaint is precisely the type of lawsuit that Congress sought to preempt when enacting the PLCAA.

Implicitly recognizing the applicability of the PLCAA, Plaintiffs attempt to plead around the statute by endeavoring to fit their purported causes of action into two of the exceptions to the Act: (1) actions brought against firearm "sellers" (as defined by the PLCAA) for negligent entrustment or negligence per se; and (2) actions brought against firearm "manufacturers" or "sellers" who knowingly violate a state or federal statute applicable to the sale or marketing of a firearm, the violation of which was a proximate cause of the harm for which relief is sought.

However, neither exception is applicable.  Plaintiffs' lawsuit should be dismissed pursuant to the PLCAA because: (1) Plaintiffs fail to plead sufficient facts to establish a negligent entrustment action under Nevada law; (2) an alleged violation of a penal statute cannot serve as the basis for a negligence per se action; (3) negligent entrustment and negligence per se actions against firearms manufacturers are preempted by the Act; and (4) Defendants did not knowingly violate any federal or state firearm statute because the Subject Rifles at issue are not "machineguns" under the law.

Plaintiffs' claims should also be dismissed pursuant to the immunity provisions of Nevada Revised Statute § 41.131, which provides that, except for a product liability action, "[n]o person has a cause of action against the manufacturer or distributor of a firearm … merely because the firearm … was capable of causing serious injury, damage or death."  Finally, separate and apart from any immunity statute, Plaintiffs' lawsuit should be dismissed pursuant to Nevada common law because their claims do not satisfy the requirements for negligent entrustment and negligence per se.  Plaintiffs have not, and cannot, sufficiently plead causation under Nevada law because the injuries and deaths at the music festival were caused by the criminal acts of the shooter.  The Court should dismiss the Complaint with prejudice because no set of facts consistent with Plaintiffs' Complaint would remedy these defects.[1]

## **PLAINTIFFS' ALLEGATIONS**

On October 1, 2017, a criminal ("Shooter") intentionally fired into a crowd of people attending the Harvest Music Festival in Las Vegas.  Plaintiffs' daughter, Carolyn Lee Parsons ("Parsons"), was shot and killed, allegedly by a bullet the Shooter fired from one of the Subject Rifles.  Compl. ¶¶ 131-32, 136, 144-45, 165, 167, 199-200.  Plaintiffs allege that the Defendant Manufacturers manufactured the Subject Rifles that were used in the shooting, and the Defendant Sellers each sold one or more of the Subject Rifles to the Shooter. Compl. ¶¶ 193-95.  The Shooter

---

[1] *Ventress v. Japan Airlines*, 603 F.3d 676, 680 (9th Cir. 2010).

also allegedly purchased more than a dozen bump stocks from a non-party, and had replaced the Subject Rifles' stocks with the bump stocks before he fired into the crowd. [2] Compl. ¶¶ 93- 97, 119, 128, 137. Plaintiffs bring an action for wrongful death based on claims of negligence per se and negligent entrustment. Both of these purported causes of action are based on the claim that Defendants violated 18 U.S.C. § 922(b)(4) and Nev. Rev. Stat. § 202.350(1)(b) because the semi-automatic rifles they manufactured or sold should be considered "machineguns" under federal and state law because the shooter was able to modify them to fire more rapidly by installing bump stocks on them.

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead "facts" that are sufficient to "nudge the[] claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Doing so "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. A "two-pronged" approach is employed in evaluating the sufficiency of allegations under Rule 12(b)(6). *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, a court considering a motion to dismiss "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Under this standard, a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555). "[M]ere conclusory statements . . . do not suffice." *Id.* Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity

---

[2] Bump stocks are "designed to be affixed to a semiautomatic long gun (most commonly an AR-type rifle or an AK-type rifle) in place of a standard, stationary rifle stock, for the express purpose of allowing 'rapid fire' operation of the semiautomatic firearm to which they are affixed … [W]hen a bump-stock-type device is affixed to a semiautomatic firearm, the device harnesses and directs the firearm's recoil energy to slide the firearm back and forth so that the trigger automatically re-engages by 'bumping' the shooter's stationary finger without additional physical manipulation of the trigger by the shooter." Bump-Stock Type Devices, 83 Fed. Reg. 66,516.

and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).

## **ARGUMENT**

### I.     **PLAINTIFFS' LAWSUIT IS PREEMPTED BY THE PLCAA**

Congress enacted the PLCAA in 2005 to prohibit the filing of lawsuits seeking to hold firearm manufacturers and sellers legally responsible for harm caused by the criminal or unlawful misuse of firearms.  Beginning in the late 1990s, victims of criminal firearms violence and state and local governments began filing lawsuits against members of the firearm industry seeking to hold them liable for damages resulting from the criminal and unlawful misuse of firearms. The liberal rules of modern pleading in some jurisdictions made it easy for even meritless lawsuits to survive motions to dismiss. Aware of these efforts, Congress found that if lawsuits of this sort were allowed to proceed, they would impose ruinous financial costs on the firearm industry, even if the plaintiffs could not succeed at trial. *See* 15 U.S.C. § 7901(a).  The strength of the PLCAA's immunity for firearm manufacturers and sellers is exemplified by the Act's clear directive that any such "action that is pending on the date of enactment of this Act shall be immediately dismissed by the court in which the action was brought or is currently pending."  *Id.* § 7902(b).

The explicit purpose of the PLCAA is to "prohibit causes of action against manufacturers, distributors, dealers, and importers of firearms . . . for the harm solely caused by the criminal or unlawful misuse of firearm[s] . . . by others when the product functioned as designed and intended," and to "prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce." 15 U.S.C. § 7901(b). Congress made several findings supporting the PLCAA's enactment, most pertinently, as follows:

- The manufacture, importation, possession, sale, and use of firearms and ammunition in the United States are heavily regulated by Federal, State, and local laws.  Such Federal laws include the Gun Control Act of 1968, the National Firearms Act, and the Arms Export Control Act.

- Lawsuits have been commenced against manufacturers, distributors, dealers and importers of firearms that operate as designed and intended which seek money damages and other relief for the harm caused by the misuse of firearms by third parties, including criminals.

- Businesses . . . that are engaged in … the lawful design, manufacture, marketing, distribution, importation, or sale to the public of firearms or ammunition products . . . are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended.

*Id.* §§ 7901(a)(3)-(5).  Based upon these findings, Congress prohibited lawsuits meeting the definition of a "qualified civil liability action," from being "brought in any Federal or State court." *Id.* § 7902(a).

### A.    <u>This Case is a Qualified Civil Liability Action</u>

As defined in relevant part by the PLCAA, a "qualified civil liability action" is a "civil action or proceeding . . . brought by any person against a manufacturer or seller of a qualified product . . . for damages, punitive damages, injunctive or declaratory relief, or penalties or other relief resulting from the criminal or unlawful misuse of a qualified product by the person or a third party . . . ." 15 U.S.C. § 7903(5)(A).  This case fits the definition precisely. It is a civil proceeding brought by persons (James and Anne-Marie Parsons) against manufacturers (the Manufacturer Defendants) and sellers (the Seller Defendants) of qualified products (the Subject Rifles) for damages and other relief based on the criminal use (the shooting of Parsons) of one of the qualified products (the Subject Rifles) by a third party (the Shooter). Compl. ¶¶ 19-33, 105, 108, 110, 112, 114, 116, 124-26, 128-29, 131-32, 136-37, 144-45, 150-63, 164-65, 167.

- 5 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

While there are six categories of claims that the PLCAA excludes from the definition of a qualified civil liability action, Plaintiffs have attempted to plead only two: (1) "an action brought against a seller for negligent entrustment or negligence per se"; and (2) "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought . . . ." 15 U.S.C. § 7903(5)(A)(ii)-(iii).  Importantly, the PLCAA— by its express terms—does not create causes of action or remedies. *See id.* § 7903(5)(C) ("no provision of this chapter shall be construed to create a public or private cause of action or remedy"). The availability of a negligent entrustment or a negligence per se action depends on whether the cause of action is recognized under an applicable state's law.  Here, Plaintiffs have not, and cannot, plead causes of action falling within these exceptions under Nevada law.

> **B.**     **Nevada Law Does Not Recognize a Negligent Entrustment Action Against a Product Seller or Manufacturer**

Although one of the exceptions to the PLCAA's definition of a qualified civil liability action is an action against a seller for negligent entrustment, such an action is not available to Plaintiffs in this case.  Because "no provision of this chapter shall be construed to create a public or private cause of action or remedy," 15 U.S.C. § 7903(5)(C), Plaintiffs' negligent entrustment claim rises or falls under Nevada law.

Nevada appellate courts have not recognized a cause of action for negligent entrustment outside the context of an entrustment of a "vehicle to an inexperienced or incompetent person." *Zugel by Zugel v. Miller*, 688 P.2d 310, 312 (Nev. 1984).  The Nevada Supreme Court has never extended the cause of action for negligent entrustment to cover actions against product sellers and manufacturers because, to be liable for negligent entrustment, the entrustor must have had a right

to control the instrumentality when it was used to cause harm.[3]  Owners and lessors of vehicles (or other instrumentalities) continue to have rights to control the use their vehicles, even when driven by others.  In contrast, product sellers and manufacturers relinquish ownership and control of the products they sell to buyers, and have no right or ability to control their subsequent use.

Nevada is not unique in requiring that a right to control an entrusted instrumentality at the time of injury be alleged and proven. For example, in Maryland, negligent entrustment liability theory is also recognized only in the context of entrustments by those who had a right to control the instrumentality when an injury occurred.[4]  Plaintiffs have not alleged, and cannot plead, that any of the Defendants had the right to control the use of any of the Subject Rifles after they were sold to the Shooter.  In the absence of such a well-pled allegation, Plaintiffs' negligent entrustment claim against the Defendants fails.

**C.**   **Plaintiffs Do Not Sufficiently Plead a Negligent Entrustment Action**

Even if a negligent entrustment action against a product seller or manufacturer were recognized under Nevada law, Plaintiffs' claim should still be dismissed. The focus of the negligent

---

[3] *Mills v. Continental Parking Corp.*, 475 P.2d 673, 674 (Nev. 1970) ("negligent entrustment theory may apply where one who has a right to control the car permits another to use it in circumstances where he knows or should know that such use may create an unreasonable risk of harm."); *accord Connell v. Carl's Air Conditioning,* 634 P. 2d 673, 675 (Nev. 1981); *Roddick by and through Roddick v. Plank*, 608 F. Supp. 229, 231 (D. Nev. 1985).

[4] *See, e.g., Broadwater v. Dorsey*, 688 A.2d 436, 440-41 (Md. Ct. App. 1997) (holding that a person without the right to prohibit use of chattel at the time of an accident is not liable for negligent entrustment); *accord Allen v. Wal-Mart Stores, LLC*, 907 F.3d 170, 179 (5th Cir. 2018) (surveying Texas law and noting that Texas has not adopted negligent entrustment with respect to the sale of chattel); *DeWester v. Watkins*, 745 N.W. 2d 330, 334 (Neb. 2008) (extending negligent entrustment of motor vehicle liability to a non-owner who nevertheless had a right to control use of the vehicle at the time of the accident); *Neary v. McDonald*, 956 P. 2d 1205, 1209 (Alaska 1998) (the right to control means that the defendant must have a greater right of possession or control than the entrustee); *Zedella v. Gibson*, 650 N.E.2d 1000, 1003–04 (1995) (stating that "if the [defendant] does not have an exclusive or superior right of control, no entrustment of the property can occur"); *Mills v. Crone*, 973 S.W. 2d 828, 831 (Ark. 1998) (one is not liable for negligent entrustment of a thing if he has no right to control its use).

entrustment tort is on the competency, maturity, or qualifications of the person to whom a potentially dangerous instrumentality is entrusted, not on the instrumentality itself.[5]  The only allegation Plaintiffs make in support of their negligent entrustment claim is that attributes of the Subject Rifles themselves created a risk of harm, regardless of who was entrusted with their use. The Complaint does not allege that any Defendant either knew, or reasonably should have known, that the Shooter was not competent to use the Subject Rifles safely, or that he had an intent to use them criminally.  For that reason, it fails to satisfy the PLCAA's requirement for a negligent entrustment action.  15 U.S.C. § 7903(5)(5) (negligent entrustment means "the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others.").

In *Soto v. Bushmaster Firearms Int'l, LLC*, the Connecticut Supreme Court rejected an identical attempt to impose negligent entrustment liability on a rifle manufacturer in a mass shooting case, based on an allegation that selling AR-type rifles to civilians constitutes negligent entrustment.  202 A.3d 262, 281-83 (Conn. 2019) (recognizing that a "cause of action for negligent entrustment will lie only when the entrustor knows or has reason to know that the direct entrustee is likely to use a dangerous instrumentality in an unsafe manner").  The plaintiffs in *Soto* made no allegation that the person who acquired the rifle was not competent to use it safely, and the court summarily rejected the plaintiffs' argument that the "commercial sale of assault weapons to civilian users constitutes negligent entrustment because the social costs of such sales outweigh the perceived benefits," stating that "[o]ther courts have rejected such a theory, as do we."  *Id.*[6]

---

[5] *See Zugel*, 688 P.2d at 312-13 (knowing entrustment of a vehicle to an "inexperienced or incompetent person" may result in liability).

[6] The fundamental defect in Plaintiffs' negligent entrustment allegations was also recognized in *McCarthy v. Olin Corp.*, 119 F.3d 148 (2d Cir. 1997). In *McCarthy*, victims of a mass shooting

Plaintiffs in this case make the same allegation and this Court should likewise reject it because knowledge of an entrustee's incompetence to handle a product safely is a vitally important element of a negligent entrustment claim that Plaintiffs ignore entirely.  Defendants anticipate that Plaintiffs will argue that their negligent entrustment action is sufficiently supported by the allegations that: (1) the Subject Rifles were dangerous; and (2) they were sold to the Shooter. Plaintiffs' argument would require a dramatic change in tort law. Such a finding would eliminate the need to plead and prove that the person entrusted with a potentially dangerous instrumentality was the type of person who could not be trusted to use it safely. The consequence of such a drastic change in the law would be that any person who entrusts a dangerous instrumentality to another is *ipso facto* negligent, and the only issue to be decided is whether the use of the instrumentality was the proximate cause of harm.

### D.    An Alleged Violation of a Penal Statute Cannot Serve as the Basis for a Negligence Per Se Action Under Nevada Law

Unlike negligent entrustment, the PLCAA does not define the requirements for an action pleaded under the negligence per se exception.  Thus, applicable state law determines whether alleged statutory violations support a negligence per se action, and whether such an action has been sufficiently pleaded.  Under Nevada law, violation of a statute "may constitute negligence *per se* only if the injured party belongs to the class of persons that the statute was intended to protect, and

---

filed suit against the manufacturer of the ammunition used by the shooter alleging, similar to what the plaintiffs allege here, that the ammunition had "severe wounding power." *Id.* at 156. The plaintiffs argued before the district court that the sale of the ammunition to the general public constituted negligent entrustment. *McCarthy v. Sturm, Ruger* & Co., 916 F. Supp. 366, 370 (S.D.N.Y. 1996). The court rejected the plaintiffs' argument, noting that negligent entrustments are made to persons who lack ordinary prudence. *Id*. The court reasoned that "[t]o extend this theory to the general public would be a dramatic change" in tort law. *Id.* The court held that recognizing a "negligent entrustment rule for the protection of the general public" would "imply that the general public lacks ordinary prudence and thus undermine the reasonable person concept so central to tort law." *Id*.

the injury is of the type that the statute was intended to prevent." *Sagebrush Ltd. v. Carson City*, 660 P.2d 1013, 1015 (Nev. 1983). The typical statutes that can serve as the basis for a negligence per se claim are traffic statutes, designed to protect travelers from motor vehicle accidents.[7]

The statutes upon which Plaintiffs rely for their negligence per se claim are both penal statutes, 18 U.S.C. § 922(b)(4) and Nev. Rev. Stat. § 202.350(1)(b), that do not support a negligence per se claim under Nevada law. "[I]n the absence of evidence of legislative intent to impose civil liability, a violation of a penal statute is not negligence per se."[8] There is no expression of legislative intent in either 18 U.S.C. § 922(b)(4) or Nev. Rev. Stat. § 202.350(1)(b) to impose civil liability for their violation, and Plaintiffs' negligence per se claim should be dismissed.

### E. The Negligent Entrustment and Negligence Per Se Exceptions to the PLCAA Do Not Apply to Actions Against Manufacturers

The exception for negligent entrustment and negligence per se actions applies only to firearm sellers, not to manufacturers. *Id.* § 7903(5)(A)(ii) ("[A]n action brought against a *seller* for negligent entrustment or negligence per se.") (emphasis added). The PLCAA defines "manufacturer" and "seller" separately; a "seller" is one who is (1) "engaged in the business" as a firearms dealer and (2) licensed to "engage in business" as a firearms "dealer." *Id.* at § 7903(6). A firearms "dealer" is defined in relevant part as "any person engaged in the business of selling firearms at wholesale or retail . . . ." 15 U.S.C. § 921(a)(11)(A). A person is "engaged in the business" of dealing firearms when he "devotes time, attention and labor to dealing in firearms in

---

[7] *See, e.g., Brannan v. Nevada Rock & Sand Co.*, 823 P.2d 291, 293 (Nev. 1992) (requirement to maintain brakes in good working order); *Barnes v. Delta Lines, Inc.*, 669 P.2d 709, 710-11 (Nev. 1983) (violation of law to "fail to yield the right of way to moving traffic while backing a vehicle on a roadway, or when entering a highway from a private way").

[8] *Hinegardner v. Marcor Resorts, L.P.V.*, 844 P.2d 800, 803 (Nev. 1993); *see also Bell v. Alpha Tau Omega Fraternity, Eta Epsilon Chapter*, 642 P.2d 161, 162-63 (Nev. 1982) ("absent evidence of legislative intent to impose civil liability we shall not conclude that the violation of a [criminal] statute is negligence per se").

the regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms."  *Id.*  § 921(a)(21).

In contrast, a "manufacturer" is defined by the PLCAA as "a person who is engaged in the business of manufacturing the product in interstate or foreign commerce and who is licensed to engage in business as such a manufacturer under chapter 44 of title 18, United States Code."  15 U.S.C. § 7903(2).[9]  Plaintiffs' negligent entrustment and negligence per se actions against the Manufacturer Defendants therefore fail for the additional and independent reason that the exception applies only to claims against sellers, not manufacturers. *Id.* § 7903(5)(A)(ii).

## F.  Defendants Did Not Violate a Statute by Manufacturing and Selling The Subject Rifles Because They are Not  "Machineguns" Under Federal or State Law

The last PLCAA exception on which Plaintiffs rely is an action in which a "manufacturer or seller of a [firearm] knowingly violated a State or Federal statute applicable to the sale or marketing of [firearms], and the violation was a proximate cause of the harm for which relief is sought. . . ." 15 U.S.C. § 7903(5)(A)(iii).  This exception has come to be known as the "predicate exception," because a plaintiff not only must present a cognizable claim, but must also allege a knowing violation of a "predicate statute." *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1132 (9th Cir. 2009).  Defendants, however, did not violate either of the statutes upon which Plaintiffs rely, 18 U.S.C. § 922(b)(4) or Nev. Rev. Stat. § 202.350(1)(b), because the Subject Rifles are not "machineguns" as a matter of law.[10]

---

[9] Chapter 44 of title 18 of the United States Code, in turn, defines a manufacturer as "any person engaged in the business of manufacturing firearms . . . for purposes of sale or distribution; and the term 'licensed manufacturer' means any such person licensed under the provisions of this chapter." 18 U.S.C. § 921(a)(10).

[10] It should be noted that Plaintiffs' negligence per se action also fails for this additional and independent reason.  In other words, even if Nevada recognized a negligence per se cause of action under the facts alleged, no such cause of action can exist if the statues at issue were not violated.

**(1)     Definition of a Machinegun Under Federal and Nevada Law**

Section 922(b)(4) of the Gun Control Act ("GCA"), states in relevant part that "it shall be unlawful for any . . . licensed manufacturer [or] licensed dealer . . . to sell or deliver … to any person any … machinegun (as defined in section 5845 of the Internal Revenue Code of 1986) … except as specifically authorized by the Attorney General consistent with public safety and necessity." 18 U.S.C. § 922(b)(4).[11] A "machinegun" is defined in Section 5845 of the National Firearms Act ("NFA") as:

> [A]ny weapon which [1] shoots, [2] is designed to shoot, or [3] can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include [4] the frame or receiver of any such weapon, [5] any part designed and intended solely and exclusively, or [6] combination of parts designed and intended, for use in converting a weapon into a machinegun, and [7] any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (bracketed numbers added).

By contrast, a "semi-automatic rifle" is defined as "any repeating rifle which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which *requires a separate pull of the trigger to fire each cartridge*."  18 U.S.C. § 921(a)(28) (emphasis added).  By alleging that the Subject Rifles would "fire automatically" only "after modification with a bump stock," the Complaint concedes that the Subject Rifles were semiautomatic when manufactured and sold.  Compl. ¶ 180.  Based on the allegations in the

---

[11] Nevada law also restricts the manufacture, sale and possession of machineguns. Nev. Rev. Stat. § 202.350(1)(b) states that a person in Nevada shall not "[m]anufacture or cause to be manufactured, or import into the State, or keep, offer or expose for sale, or give, lend, possess or use a machine gun . . . unless authorized by federal law." The definition of a "machinegun" under Nevada law is similar to the federal law definition: "any weapon which shoots, is designed to shoot or can be readily restored to shoot more than one shot, without manual reloading, by a single function of the trigger." *Id.* § 202.350(8)(c). Importantly, Section 202.350(1)(b) applies only to activities within the state of Nevada, and does not apply to the out-of-state Defendant Manufacturers based on the allegations in the Complaint.

Complaint, the key phrase in the definition of "machinegun" is "designed to shoot."[12]   That definition was applied to an M-16 machinegun from which the auto sear was removed, thereby "disabling the weapon's automatic firing function," but "simply replacing the auto sear would reenable the gun's automatic fire capabilities." *United States v. Gravel*, 645 F.3d 549, 552 (2d Cir. 2011).   Similarly, ATF explained in Ruling 82-2[13] that the "designed to shoot" definition refers to features that would allow conversion of a firearm into a machinegun "by simple modification or elimination of *existing component parts*" (emphasis added), *i.e.*, parts already assembled into the firearm. (https://www.atf.gov/firearms/docs/ruling/1982-2-kg-9-pistol-nfa-weapon/download).

The Complaint mentions the "can be readily restored to shoot" definition, Compl. ¶ 70, but does not allege that it is relevant here.[14]   Case law explains the differences between the "designed" and the "readily restorable" definitions. In *U.S. v. Hester*, 855 F.2d 863, at *1 (9th Cir. 1988), the Court of Appeals for the Ninth Circuit held a firearm that is originally "designed to fire in an

---

[12] The Complaint alleges that the Subject Rifles are machineguns because they had "*design features* that allow for automatic fire through *simple modification*." Compl. ¶ 8 (emphasis added).   It alleges that they "possessed design features, including an easily removable stock, that allowed modification with a bump stock." *Id.* ¶ 179.   Plaintiffs contend that the Subject Rifles were designed "with an easily removable stock," which is the only "design feature[]" they specifically claim make them "capable of automatic fire through simple modification." *Id.* ¶¶ 184-91.

[13] The ATF is a federal law enforcement agency within the Department of Justice that is authorized to promulgate and publish "orders, delegations, determinations, rules, personnel actions, permits, agreements, grants, contracts, certificates, licenses, registrations, and privileges." *See* 27 C.F.R. § 70.701 (2011), *extended by* 28 C.F.R. § 0.133 (2019).   As such, the Court may take judicial notice of the ATF's rules, open letters, guidebooks, and classification decisions.   *See, e.g., Prescott v. Slide Fire Sols., LP*, 341 F. Supp. 3d 1175, 1188 (D. Nev. 2018) (taking judicial notice of the ATF Guidebook as well as ATF open letters).

[14] The Ninth Circuit Court of Appeals held that the "can be readily restored to shoot" definition refers to a firearm that in its original state was a machinegun, because the "plain and unambiguous ordinary meaning of 'restored' as used in the context of § 5845(b) is 'to bring back to or put back into a former or original state.'" *U.S. v. TRW Rifle 7.62X51 Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 687-91 (9th Cir. 2006) (citing Webster's Third New Int'l Dictionary (1961) and holding that a semi-auto rifle made from a fully-automatic M-14 was "readily restorable" to again fire automatically, and therefore a machinegun).

automatic mode," but will not do so in its present condition because of a "faulty extractor switch," "could have been 'readily restored' to shoot automatically." In contrast, an item that "was never in the first place designed to shoot" cannot be considered a machinegun on the basis that it can be modified to fire fully automatic.[15]

### (2)    The Supreme Court has Recognized that Rifles Like the Subject Rifles are Not Machineguns

In *Staples v. United States*, 511 U.S. 600 (1994), the Supreme Court recognized the distinction between semi-automatic AR-type rifles and statutorily-defined machineguns. In *Staples*, the defendant had been convicted of possession of an unregistered machinegun in violation of 26 U.S.C. § 5861(d). The issue before the Court was whether the government was required to prove beyond a reasonable doubt that the defendant knew the rifle he possessed had characteristics that made it a machinegun, as defined by 26 U.S.C. § 5845(b). The firearm at issue in *Staples* was a semi-automatic AR-type rifle that had been modified to fire automatically by filing away a metal stop that prevented the functioning of parts that, if installed, would allow for full automatic firing. *Id*. at 603. The defendant professed ignorance that his rifle had been modified and that it could fire automatically, and asked the district court to instruct the jury that the government had the burden to prove that he knew the firearm was a fully automatic firearm. The instruction was refused, and the defendant was convicted. *Id*. at 603-04.

The Court in *Staples* recognized the differences between semi-automatic AR-type rifles and fully automatic firearms:

> The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon. The M-16, in contrast, is a selective fire rifle that allows the operator, by rotating a selector switch, to choose semiautomatic or automatic fire. Many M-16 parts are interchangeable with those in the AR-15 and can be used to convert the AR-15 into an automatic weapon.

---

[15] *United States v. Seven Miscellaneous Firearms*, 503 F. Supp. 565, 574 (D.D.C. 1980) (holding that non-firing museum-pieces that were never designed to shoot were not machineguns on the basis that they could be "readily restored" to fire fully automatic).

511 U.S. at 603.  The Court specifically held that Section 5861(d) "does not suggest that any significance should attach to readily convertible semiautomatics, for that class bears no relation to the definitions in the Act. . . . The parties assume that virtually all semiautomatics may be converted into automatics . . . ."  *Id.* at 612 n.6.

Thus, the Supreme Court explicitly held that a semi-automatic firearm is not a machinegun on the basis that it is "readily convertible" to a machinegun. *Id.*  Indeed, the phrase "readily convertible" (as opposed to "readily restored") is not found in the definition of a machinegun set forth in 26 U.S.C. § 5845(b).

> **(3)     A Firearm is Not "Designed" as a Machinegun Simply Because One Can Make It Fire Automatically by Adding New Parts, Such as a Bump Stock**

In Ruling 82-2, the ATF explained that: (1) the "shoots automatically" part of the Section 5845(b) "machinegun" definition covers firearms that will shoot automatically; (2) the "readily restored to shoot automatically" part of the definition applies to firearms that could previously shoot automatically, but will not in their present condition; and (3) the "designed to shoot automatically" part of the definition covers firearms that have not previously functioned as "machineguns," but have design features that facilitate fully automatic fire "by a simple modification or elimination of existing parts."        (https://www.atf.gov/firearms/docs/ruling/1982-2-kg-9-pistol-nfa-weapon/download). The firearm in that case was considered to be "designed" as a machinegun because "a simple modification to it, such as cutting, filing, or grinding, allow[ed it] to operate automatically." *Id*.

By contrast, a semiautomatic rifle is not "designed" as a machinegun based on the mere existence and possession by a third-party of parts that could convert it into one.  That clear statutory distinction as applied to AR-15 rifles was the basis of ATF Ruling 81-4, which concerned a conversion kit known as the "AR15 auto sear." (https://www.atf.gov/resource-center/docs/atf-

ruling-81-4pdf/download).  The ATF found "that the single addition of this auto sear to certain AR15 type semiautomatic rifles, manufactured with M16 internal components already installed, will convert such rifles into machineguns." *Id*.

The auto sear was thus found to be a "combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger."  ATF Ruling 81-4.  It was the "addition" of this conversion kit to AR-15 rifles with "M16 internal components already installed" that transformed the rifles into machineguns.  *Id*.  Importantly, however, the mere existence of this conversion kit did not transform such rifles into machineguns under the "designed" definition, as ATF characterized them as "AR15 type *semiautomatic rifles*."  *Id*. (emphasis added).

Similarly,    in    Ruling    2006-2    (https://www.atf.gov/firearms/docs/ruling/2006-2-classification-devices-exclusively-designed-increase-rate-fire/download),    the    ATF    considered various bump stock devices (Akins Accelerator) designed for use with Ruger 10/22 semiautomatic rifles that used energy from a coiled spring and, "once activated by a single pull of the trigger, initiate an automatic firing cycle which continues until either the finger is released or the ammunition supply is exhausted."  The ATF concluded that such devices were machineguns on the basis that they are a "part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun" for purposes of 28 U.S.C. § 5845(b).  *See Akins v. U.S.*, 312 Fed. App'x 197, 198 (11th Cir. 2009).  Notably, the ATF did not find that Ruger 10/22 semiautomatic rifles were machineguns simply because such a conversion device was available.

       **(4)**      **The Bump Stocks Installed on the Subject Rifles Were Legal at All Times Relevant to this Lawsuit**

This Court previously addressed a case arising from the October 1, 2017 shooting brought against the manufacturer of the bump stocks the Shooter used.  *Prescott v. Slide Fire Solutions, LP*,

341 F. Supp. 3d 1175 (D. Nev. 2018) (Navarro, J.). The court in *Prescott* dismissed plaintiffs'

claims against the bump stock manufacturer pursuant to the PLCAA (with leave to replead). In its

decision, this Court discussed a letter that the ATF had issued to the manufacturer of the bump

stocks before the shooting occurred, in which the ATF concluded that "the bump-stock is a firearm

part and is not regulated as a firearm under [the] Gun Control Act or the National Firearms Act."

*Id.* at 1189.

It was not until well-after the shooting, in December 2018, that the ATF reclassified bump

stocks as machineguns. Bump-Stock Type Devices, 83 Fed. Reg. 66,514-54. The ATF did so by

amending the definition of a machinegun in the regulations enacted pursuant to the GCA and the

NFA as follows:

> [T]he term "automatically" as it modifies "shoots, is designed to shoot, or can be
> readily restored to shoot," means functioning as the result of a self-acting or self-
> regulating mechanism that allows the firing of multiple rounds through a single
> function of the trigger; and "single function of the trigger" means a single pull of
> the trigger and analogous motions. The term "machine gun" includes a bump-stock-
> type device, *i.e.*, a device that allows a semi-automatic firearm to shoot more than
> one shot with a single pull of the trigger by harnessing the recoil energy of the
> semiautomatic firearm to which it is affixed so that the trigger resets and continues
> firing without additional physical manipulation of the trigger by the shooter.

27 C.F.R. §§ 478.11 & 479.11.

The ATF noted that since issuing Ruling 2006-2, in which it concluded that the Akins

Accelerator was a machinegun, it had "issued classification decisions concluding that other bump-

stock-type devices were not machineguns, primarily because the devices did not rely on internal

springs or similar mechanical parts to channel recoil energy." 83 Fed. Reg. at 66,514. The ATF

concluded that those decisions "did not include extensive legal analysis relating to the definition of

'machinegun,'" and decided to "promulgate a rule that would bring clarity to the definition of

'machinegun'—specifically with respect to the terms 'automatically' and 'single function of the

trigger,' as those terms are used to define 'machinegun.'" *Id.*

The ATF further noted that based on its earlier definition of "machinegun" in the GCA and the NFA, "semiautomatic firearms modified with these bump-stock-type devices did not fire 'automatically,' ... [and] were not machineguns' . . . ." 83 Fed. Reg. at 66,516 (noting that the ATF has not regulated the bump stocks as "machineguns under the NFA or GCA" and individuals could purchase them "without undergoing background checks or complying with any other Federal regulations applicable to firearms.").

The ATF's amendment of 27 C.F.R. §§ 478.11 & 479.11 to reclassify bump stocks as machineguns did not go into effect until March 26, 2019, and the rule only attached criminal liability to the manufacture, sale, or possession of bump stocks after that date.[16]  Therefore, *when* Defendants manufactured and sold the Subject Rifles, *when* the bump stocks were installed on them, and *when* the Subject Rifles with the bump stocks installed were used by the Shooter, bump stocks (and semiautomatic rifles with bump stocks installed on them) were not machineguns, according to ATF and under *Guedes*.  Significantly, the new definition of a machinegun in 27 C.F.R. §§ 478.11 & 479.11 does not transform "unmodified semiautomatic rifles" into machineguns. 83 Fed Reg. at 66,532-34; *Guedes*, 920 F.3d at 32.

### (5) Congress has Recognized that Rifles Like the Subject Rifles are Not Machineguns

Plaintiffs suggest that the semi-automatic AR-15 rifles like the Subject Rifles have always been machineguns, and that "[t]ransforming [them] into a truly civilian rifle would have required a different design."[17]  Congress necessarily rejected Plaintiffs' argument that the Subject Rifles are

---

[16] 83 Fed. Reg. at 66,525 ("This rule . . . makes clear that individuals are subject to criminal liability only for possessing bump-stock-type devices after the effective date of regulation, not for possession before that date. No action taken before the effective date of the regulation is affected under the rule."); *Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1, 8-9 (D.C. Cir. 2019).

[17] Compl. ¶ 62.  *See also id.* ¶¶ 76 (contending that a rifle "manufactured to fire in a semi-automatic mode is nevertheless a machinegun if it can be converted to fire automatically through 'simple

machineguns.  The 1994 assault weapons ban, 18 U.S.C. § 922(v), which expired in 2004 pursuant to a sunset provision, banned "semi-automatic assault weapons," which it defined in relevant part as the Colt AR-15, including copies or duplicates, or a "semiautomatic rifle with the ability to accept a detachable magazine and at least two of five specified features, *id.* §§ 921(a)(30)(A)(iv) & (B).  If Plaintiffs' position were correct, there would have been no need for Congress to have temporarily banned the Subject Rifles as semi-automatic assault weapons, because they would already be banned as machineguns.

      **(6)**      **Defendants Could Not Have Knowingly Violated 18 U.S.C. § 922(b)(4) or Nev. Rev. Stat. § 202.350(1)(b) When the Subject Rifles were Manufactured and Sold**

Finally, the predicate exception can only be satisfied by a knowing violation of a statute, which is an impossibility in this case.  Allegations that Defendants knowingly violated either 18 U.S.C. § 922(b)(4) or Nev. Rev. Stat. § 202.350(1)(b), require pleading facts indicating that Defendants had either actual knowledge that the Subject Rifles were machineguns, or were willfully blind that they were machineguns.[18]  For example, in *Staples*, the U.S. Supreme Court held that the Government must prove that the defendant had knowledge of the features of a firearm that made it a machinegun.  511 U.S. at 613.  As explained above, at the time Defendants manufactured and sold the Subject Rifles, Congress and the Supreme Court did not consider semi-automatic AR-15 type rifles to be machineguns, and the ATF officially considered semi-automatic AR-15 type rifles to not be machineguns, even if they had bump stocks installed on them.  Therefore, although Defendants deny that the Subject Rifles are machineguns under the statutes, it is undisputed that

---

modification'"); 92 ("Despite the fact that bump stocks . . . unequivocally converted [semi-automatic] AR-15s into fully automatic machineguns, the Defendant Manufacturers did nothing to change the design features of the weapon that rendered it susceptible to simple modification.").

[18] *See Global–Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769-70 (2011) (explaining the willful blindness standard).

Defendants could not have knowingly violated either 18 U.S.C. § 922(b)(4) or Nev. Rev. Stat. § 202.350(1)(b) by manufacturing and selling the Subject Rifles.

## II.   PLAINTIFFS' CLAIMS ARE BARRED BY NEV. REV. STAT. § 41.131

The Nevada Legislature passed Nev. Rev. Stat. § 41.131 to make clear that, at least in Nevada, "if someone shoots a firearm and hurts somebody, you can't sue the firearms manufacturer because it shoots."[19]  This is because "a gun in itself is not to be determined as at fault in the case of a death or injury . . . . [Rather] the liability would be on the handler of the gun."[20]  In fact, the Senate Committee Chairman "clarified that it was [the bill sponsor's] intent to ***not*** have a firearms manufacturer sued by his heirs if he were murdered."[21]  Thus, Section 41.131 specifically provides that:

> 1.   No person has a cause of action against the manufacturer or distributor of any firearm or ammunition merely because the firearm or ammunition was capable of causing serious injury, damage or death, was discharged and proximately caused serious injury, damage or death. This subsection is declaratory and not in derogation of the common law.

> 2.   This section does not affect a cause of action based upon a defect in design or production. The capability of a firearm or ammunition to cause serious injury, damage or death when discharged does not make the product defective in design.

Section 41.131 has a protective purpose, requiring liberal construction. As repeatedly stated by the Nevada Supreme Court, "[s]tatutes with a protective purpose should be liberally construed in order to effectuate the benefits intended to be obtained."[22]  Here, the statute is indisputably

[19] Hearing on S.B. 211 Before the S. Comm. on Judiciary, 1985 Leg., 63rd Leg. Sess. (Nev. Apr. 17, 1985).

[20] Hearing on S.B. 211 Before the S. Comm. on Judiciary, 1985 Leg., 63rd Leg. Sess. (Nev. Mar. 13, 1985).

[21] Hearing on S.B. 211 Before the S. Comm. on Judiciary, 1985 Leg., 63rd Leg. Sess. (Nev. Apr. 17, 1985) (emphasis added).

[22] *State Dep't of Bus. & Indus., Fin. Institutions Div. v. Dollar Loan Ctr., LLC*, 412 P.3d 30, 33 (Nev. 2018); *see also, e.g.*, *Colello v. Adm'r of Real Estate Div. of State of Nev.*, 683 P.2d 15, 17

intended to protect firearm manufacturers and distributors (sellers) from civil claims arising from criminal shootings by third parties.

Further, Section 41.131's language is plain and unambiguous: under Nevada law, no cause of action exists against a firearm manufacturer or distributor because the firearm was capable of causing and did cause serious injury, damage, or death, unless caused by a defect in design or production. Plaintiffs' claims are against manufacturers and distributors of the Subject Rifles for the simple reason that they were capable of, and one of them allegedly did, cause serious injury, damage, or death to Parsons.[23]  Plaintiffs are not raising a claim based upon a defect in the design or production of the Subject Rifles, so their claims are barred by Section 41.131(1).

Although there is no caselaw directly addressing Section 41.131, *Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 3d 1216 (D. Colo. 2015), applying Colorado's equivalent statute, Colo. Rev. Stat. § 13-21-504.5(1),[24] is instructive. In *Phillips*, the parents of a woman killed during a mass shooting at a movie theatre in Aurora, Colorado sued several retailers that allegedly sold ammunition used by the shooter.  84 F. Supp. 3d at 1220.  Similar to Nevada law, Section 13-21-504.5 limits claims against firearm manufacturers and distributors to those based on product liability.  The court ultimately held that the exceptions to Section 13-21-504.5's "broad immunity" did not apply, and therefore dismissed the claims as barred.  *Id.* at 1222.

The California Supreme Court's decision in *Merrill v. Navegar, Inc.*, 28 P.3d 116 (Cal. 2001) is also instructive.  *Merrill* dealt with claims arising out of a mass shooting at an office

---

(Nev. 1984) ("Statutes with a protective purpose should be liberally construed in order to effectuate the benefits intended to be obtained.").

[23] *See* Complaint at 20:26-23:6, 23:11-14; 24:13-15; 25:7-26:16. References are to page and line numbers because the Complaint duplicates paragraph numbers 204-11, but not their content.

[24] "A person or other public or private entity may not bring an action in tort, other than a product liability action, against a firearms or ammunition manufacturer, importer, or dealer for any remedy arising from physical or emotional injury, physical damage, or death caused by the discharge of a firearm or ammunition."  Colo. Rev. Stat. § 13-21-504.5(1).

building in San Francisco.  *Id.* at 120.  To support their negligence claims, plaintiffs claimed that Navegar knew, or should have known, that its firearms were "likely to be enhanced by the addition of products such as high-capacity magazines" and "would be used to kill or injure innocent persons in violent criminal acts such as the mass killing committed by [the perpetrator]." *Id.* at 121.  The court held that the plaintiffs' claims could not proceed "because the Legislature ha[d] declared as a matter of public policy that a gun manufacturer may not be held liable" for a firearm's "potential to cause serious injury, damage, or death when discharged." *Id.* at 119.  Nevada's legislature has made that same policy decision.  Based on black-letter Nevada law, Plaintiffs' claims are barred and should be dismissed with prejudice.

### III.   PLAINTIFFS HAVE NOT SUFFICIENTLY PLEADED CAUSATION

Plaintiffs have failed to sufficiently allege that Defendants proximately caused their damages.  Proximate cause is defined as "any cause which in natural foreseeable and continuous sequence unbroken by any efficient intervening cause, produces the injury complained of and without which the result would not have occurred."[25]  Proximate cause can properly be decided as a matter of law in Nevada.[26]  "When a third party commits an intentional tort or a crime, the act is a superseding cause, even when the negligent party created a situation affording the third party an opportunity to commit the tort or crime." *Bower v. Harrah's Laughlin, Inc.*, 215 P.3d 709, 725 (Nev. 2009).  The only exception is where the unlawful act was foreseeable. *Anderson v. Mandalay Corp.*, 358 P.3d 242, 248 (Nev. 2015). "[C]riminal or tortious third-party conduct typically severs the chain of proximate causation between a plaintiff and a defendant, [although] the chain remains

---

[25] *Clark County Sch. Dist. v. Payo*, 403 P.3d 1270, 1279 (Nev. 2017).

[26] *Van Cleave v. Kietz-Mill Minit Mart*, 633 P.2d 1220, 1222, (Nev. 1981); *Kusmirek v. MGM Grand Hotel, Inc.*, 7 Fed. App'x 734, 736, 2001 WL 357515, at *1 (9th Cir. 2001) (unpublished decision).

unbroken when the third party's intervening intentional act is reasonably foreseeable." *Price v. Blaine Kern Artista, Inc.*, 893 P.2d 367, 370 (Nev. 1995).

To determine if an intervening cause is foreseeable, Nevada courts consider six factors:

> whether (1) the intervention causes the kind of harm expected to result from the actor's negligence, (2) the intervening event is normal or extraordinary in the circumstances, (3) the intervening source is independent or a normal result of the actor's negligence, (4) the intervening act or omission is that of a third party, (5) the intervening act is a wrongful act of a third party that would subject him to liability, and (6) the culpability of the third person's intervening act.

*Bower*, 215 P.3d at 725 (emphasis added).

Based on the *Bower* factors, the October 1, 2017 shooting was an extraordinary event and not a normal or foreseeable consequence of Defendants' lawful manufacture and sale of legal firearms. Plaintiffs fail to plead any facts that would have given Defendants—or any other person— reasonable cause to anticipate that the Shooter was intent on committing these crimes.

Firearms, like the Subject Rifles at issue in this case, are lawfully owned by "millions of Americans" for entirely lawful purposes, including hunting, self-defense and target shooting.[27] An allegation that a firearm can be used in a crime is simply insufficient to plead causation under *Iqbal* and *Twombly*. If it were, the potential liability of all firearm manufacturers and sellers will be limitless because every time a firearm (or any other potentially dangerous instrumentality) is used to intentionally cause harm, there will be someone other than the criminal to blame.

Based on Plaintiffs' arguments, there is nothing Defendants could have done differently to avoid being held liable for damages caused by the Shooter's criminal actions. The only manner in which Defendants could have avoided liability – whether for the damages caused by the Shooter

---

[27] *Shew v. Malloy*, 994 F. Supp. 2d 234, 245 (D. Conn. 2014), *aff'd in part, rev'd in part, sub nom.*, *New York State Rifle & Pistol Ass'n. v. Cuomo*, 804 F. 3d 242 (2d Cir. 2015); *see also Friedman v. Highland Park*, 784 F. 3d 406, 411 (7th Cir. 2015) (recognizing that semi-automatic rifles are useful for self-defense); *Heller v. District of Columbia*, 670 F.3d 1244, 1288 (D.C. Cir. 2011) (Kavanaugh, J. dissenting) (recognizing that semi-automatic rifles are commonly used for self-defense, hunting and target shooting).

1  using the Subject Rifles, or future crimes committed by other persons using semi-automatic AR-15

2  rifles – would be to stop manufacturing and selling such rifles to civilians entirely.

3  ## CONCLUSION

4  For the reasons stated above, Defendants respectfully request that Plaintiffs' Complaint be

5  dismissed with prejudice.

6

7  Dated September 24, 2019.

8  Respectfully submitted by:

9  */s/ Scott C. Allan*
   John F. Renzulli (*Pro Hac Vice*)

10  jrenzulli@renzullilaw.com
    Christopher Renzulli (*Pro Hac Vice*)

11  crenzulli@renzullilaw.com
    Scott C. Allan (*Pro Hac Vice*)

12  sallan@renzullilaw.com
    Renzulli Law Firm, LLP

13  One North Broadway, Suite 1005
    White Plains, NY

14  Telephone: (914) 285-0700
    Facsimile:  (914) 285-1213

15

16  Counsel for Defendants Colt's Manufacturing

17  Company, LLC, Colt Defense, LLC, Lewis
    Machine & Tool Company, and LWRC

18  International, LLC

19  _____

20  */s/ Jay J. Schuttert*
    Jay J. Schuttert (Nev. #8656)

21  jschuttert@efstriallaw.com
    Alexandria L. Layton (Nev. #14228)

22  alayton@efstriallaw.com
    Evans Fears & Schuttert LLP

23  2300 West Sahara Avenue, Suite 950
    Las Vegas, NV 89102

24  Telephone: (702) 805-0290
    Facsimile:  (702) 805-0291

25

26  Counsel for Defendants Colt's Manufacturing

27  Company,   LLC,   Colt   Defense,   LLC,

28

*/s/ V.R. Bohman*
Patrick G. Byrne (Nev. #7636)
pbyrne@swlaw.com
V.R. Bohman (Nev. #13075)
vbohman@swlaw.com
Snell & Wilmer, LLP
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169-5958
Telephone: (702) 784-5200
Facsimile:  (702) 784-5252

Counsel for Defendants Daniel Defense, Inc.,
Patriot Ordnance Factory, and Sportsman's
Warehouse

_____

*/s/ Robert C. Van Arnam*
Camden R. Webb (*Pro Hac Vice*)
crwebb@williamsmullen.com
Robert C. Van Arnam (*Pro Hac Vice*)
rvanarnam@williamsmullen.com
Williams Mullen, PC
301 Fayetteville Street, Suite 1700
Raleigh, NC 27601
Telephone: (919) 981-4000
Facsimile:  (919) 981-4300

– and –

Justin S. Feinman (*Pro Hac Vice*)
jfeinman@williamsmullen.com
Turner A. Broughton (*Pro Hac Vice*)
tbroughton@williamsmullen.com

Christensen Arms, Lewis Machine & Tool Company, and LWRC International, LLC

– and –

Bryon J. Benevento (Applying *Pro Hac Vice*)
benevento.bryon@dorsey.com
Dorsey & Whitney, LLP
111 S. Main Street, Suite 2100
Salt Lake City, UT 84111-2176
Telephone: (801) 933-8958
Facsimile:  (801) 933-7373

Counsel for Defendant Christensen Arms

---

*/s/ Danny C. Lallis*
Anthony Pisciotti (*Pro Hac Vice*)
apisciotti@pmlegalfirm.com
Ryan Erdreich (*Pro Hac Vice*)
rerdreich@pmlegalfirm.com
Danny C. Lallis  (*Pro Hac Vice*)
dlallis@pmlegalfirm.com
Pisciotti Malsch
30 Columbia Turnpike, Suite 205
Florham Park, NJ 07932
Telephone: (973) 245-8100
Facsimile:  (973) 245-8101

– and –

Loren Young
lyoung@lgclawoffice.com
Lincoln, Gustafson & Cercos
3960 Howard Hughes Parkway, Suite 200
Las Vegas, NV 89169
Telephone: (702) 257-1997
Facsimile:  (702) 257-2203

Counsel for Defendant Noveske Rifleworks, LLC

---

*/s/ Ismail Amin*
Ismail Amin
iamin@talglaw.com
Jessica Guerra
jguerra@talglaw.com

Williams Mullen, PC
200 South 10th Street, 16th Floor
Richmond, VA 23219
Telephone: (804) 420-6000
Facsimile:  (804) 420-6507

– and –

John H. Mowbray
jmowbray@spencerfane.com
Mary E. Bacon
mbacon@spencerfane.com
Jessica Chong
jchong@spencerfane.com
Spencer Fane LLP
300 South 4th Street, Suite 950
Las Vegas, NV 89101
Telephone: (702) 408-3414
Facsimile:  (702) 408-3401

Counsel for Defendant FN America, LLC

---

*/s/ James B. Vogts*
James B. Vogts (*Pro Hac Vice*)
jvogts@smbtrials.com
Swanson, Martin & Bell LLP
330 N. Wabash Suite 3300
Chicago, IL 60611
Telephone: (312) 321-9100
Facsimile:  (312) 321-0990

– and –

Michael Nunez
mnunez@murchisonlaw.com
Murchison & Cumming, LLP
350 S. Rampart Blvd., Suite 320
Las Vegas, NV 89145
Telephone: (702) 360-3956
Facsimile:  (702) 360-3957

Counsel for Defendant Guns and Guitars, Inc.

The Amin Law Group, Ltd.
3753 Howard Hughes Parkway, Suite 200
Las Vegas, NV 89169
Telephone: (702) 990-3583
Facsimile:  (702) 441-2488

– and –

Christopher M. Chiafullo (Applying *Pro Hac Vice*)
cchiafullo@chiafullogroup.com
The Chiafullo Group, LLC
244 Fifth Avenue, Suite 1960
New York, NY 10001
Telephone: (908) 741-8531

Counsel for Defendants Discount Firearms and Ammo, LLC, DF&A Holdings, LLC, and Maverick Investments, LP

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **DEFENDANTS' MOTION TO DISMISS THE COMPLAINT** was electronically served on counsel of record this 24th day of September, 2019, using the Court's CM/ECF System and via email to:

Matthew L. Sharp - matt@mattsharplaw.com
Richard H. Friedman - rfriedman@friedmanrubin.com
Joshua D. Koskoff - jkoskoff@kosskoff.com
Katherine L. Mesner-Hage - khage@koskoff.com
John F. Renzulli - jrenzulli@renzullilaw.com
Christopher Renzulli - crenzulli@renzullilaw.com
Jay J. Schuttert – jschuttert@efstriallaw.com
Alexandria L. Layton – alayton@efstriallaw.com
Bryon J. Benevento - benevento.bryon@dorsey.com
Patrick G. Byrne – pbyrne@swlaw.com
V.R. Bohman - vbohman@swlaw.com
Camden R. Webb – crwebb@williamsmullen.com
Robert C. Van Arnam – rvanarnam@williamsmullen.com
Justin S. Feinman – jfeinman@williamsmullen.com
Turner Broughton – tbroughton@williamsmullen.com
John H. Mowbray – jmowbray@spencerfane.com
Mary E. Bacon – mbacon@spencerfane.com
Jessica Chong – jchong@spencerfane.com
Anthony Pisciotti – apisciotti@pmlegalfirm.com
Ryan Erdreich – rerdreich@pmlegalfirm.com
Danny C. Lallis – dlallis@pmlegalfirm.com
Loren Young – lyoung@lgclawoffice.com
Ismail Amin - iamin@talglaw.com
Jessica Guerra – jguerra@talglaw.com
Christopher M. Chiafullo – cchiafullo@chiafullogroup.com
James Vogts - jvogts@smbtrials.com
Michael Nunez mnunez@murchisonlaw.com

*/s/ Scott C. Allan*
Scott C. Allan (*Pro Hac Vice*)
sallan@renzullilaw.com
Renzulli Law Firm, LLP
One North Broadway, Suite 1005
White Plains, NY
Telephone: (914) 285-0700
Facsimile:  (914) 285-1213