**MATTHEW L. SHARP, ESQ.**
Nevada State Bar No. 4746
Matthew L. Sharp, Ltd.
432 Ridge Street
Reno, NV 89501
(775) 324-1500
matt@mattsharplaw.com

**RICHARD H. FRIEDMAN, ESQ.**
Nevada State Bar No. 12743
Friedman | Rubin PLLP
1126 Highland Avenue
Bremerton, WA 98337
(360) 782-4300
rfriedman@friedmanrubin.com

**JOSHUA D. KOSKOFF, ESQ.** (Admitted *PHV*)
**KATHERINE L. MESNER-HAGE, ESQ.** (Admitted *PHV*)
KOSKOFF, KOSKOFF & BIEDER, PC
350 Fairfield Ave.
Bridgeport, CT 06604
(203) 336-4421
jkoskoff@koskoff.com
khage@koskoff.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JAMES PARSONS, et al., | CASE NO.: 2-19-cv-01189-APG-EJY |
|        Plaintiffs, | |
| vs. | |
| COLT'S MANUFACTURING COMPANY LLC; et al., | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
|        Defendants. | |

## INTRODUCTION

"Short of bombs, missiles, and biochemical agents, we can conceive
of few weapons that are more dangerous than machine guns."

*United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012)

Plaintiffs brought this action because Defendants bear legal responsibility for the carnage at the Route 91 Harvest music festival in Las Vegas on October 1, 2017, which claimed 58 lives and injured more than 400. Las Vegas was the most lethal mass shooting in American history – a devastating superlative in a country where the names of towns and schools are immediately associated with a body count. What made Las Vegas exceptional was the shooter's arsenal: twelve AR-15 machine guns[1] manufactured and sold by Defendants with full knowledge of the weapons' military design, modularity, and capacity for automatic fire through simple modification.

Defendants' conduct violated longstanding federal and state law designed to protect the public from the catastrophic danger posed by machine guns. Those statutory violations, in turn, give rise to causes of action expressly preserved by the Protection of Lawful Commerce in Arms Act ("PLCAA"). Defendants attempt to shirk their legal responsibility by proffering an untenable interpretation of federal law and ignoring Plaintiffs' extensive factual allegations. The Court should deny Defendants' motion.

## THE ALLEGATIONS OF THE COMPLAINT

The last century has seen precious little consensus when it comes to firearms policy, with one notable exception: machine guns. It started with the Thompson submachine gun, or "Tommy Gun," which was designed and manufactured to arm American soldiers fighting in World War I. Compl. ¶ 35. But the war ended before prototypes could be shipped abroad and

---

[1] This brief uses the modern spelling of "machine gun" unless quoting from the National Firearms Act or other sources that retain the older version, "machinegun."

1

the manufacturer set its sights on the civilian market.  *Id.*  For fifteen years, the country permitted access to weapons capable of spraying hundreds of rounds per minute.  *Id.* ¶¶ 2, 35, 38.  The experiment was a boon to organized crime and a catastrophe for public safety.  *Id.* ¶¶ 1-2, 37.  By 1934, the country had witnessed enough carnage.  *Id.* ¶ 38.  Congress, the Attorney General, the NRA, and the firearms industry united around a common goal, best expressed by AG Cummings: "A machine gun, of course, ought never to be in the hands of any private individual."  *Id.* ¶ 4.  It was this sentiment that spawned the National Firearms Act ("NFA") and a decades-long effort to protect the public from automatic weapons.[2]

The defining characteristic of a machine gun is the capacity to produce a rate of fire that is unconstrained by the shooter's trigger finger.  *Id.* ¶ 47.  In 1934, the president of the NRA dissuaded Congress from defining a machine gun based on how many rounds it could fire without reloading.  *Id.* ¶¶ 43, 46.  The "essence of a machinegun," he explained, was the absence of a human constraint on the rate of fire.  *Id.* ¶ 47.  Semiautomatic firearms "require a separate pull of the trigger for every shot fired," and although a shooter "can keep firing that as fast as [he] can pull the trigger, . . . that is not properly a machinegun and in point of effectiveness any gun so operated will be very much less effective."  *Id.* ¶ 48.  Persuaded by Mr. Frederick's testimony, Congress enacted the definition that endures today: the ability to fire "more than one shot, without manual reloading, by a single function of the trigger."  *Id.* ¶ 46.

On October 1, 2017, eighty-three years later, American citizens witnessed firsthand the terrifying lethality of machine gun fire.  In a hotel room thirty-two stories above ground, a man fired at a massive crowd some 300 yards away.  *Id.* ¶ 145.  With him in the room were twelve

---

[2] The NFA did not prohibit the sale of machine guns; instead, it levied a 100% tax with the goal of making the weapons prohibitively expensive.  Compl. ¶ 39.  Though legislators preferred a ban, they believed the Commerce Clause did not confer the necessary authority.  *Id.* ¶¶ 40-41. This thinking had changed by the time Congress passed the Firearm Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986), which made it illegal to manufacture and sell machine guns.

weapons built to military specifications. *Id.* ¶¶ 61-63, 106, 113, 115, 123, 127. According to reports from the battlefield, for which these weapons were designed, a single round could decapitate a person. *Id.* ¶¶ 54-59. In less than ten minutes, the shooter used each of the twelve weapons. *Id.* ¶ 163. Each time he picked up a new weapon, the shooter pulled the trigger, then immobilized his trigger finger. *Id.* ¶¶ 94, 137. All told, between the twelve weapons, the shooter likely pulled the trigger no more than fourteen times. *Id.* ¶¶ 151-162.[3] Yet this minimal effort caused one thousand and forty-nine bullets to rain down on the crowd below. *Id.* ¶ 163. Fifty-eight people were killed, including 31-year-old Carrie Parsons, and more than 400 were injured. *Id.* ¶¶ 15, 17. That's approximately 30 people killed or maimed for each trigger pull.

The road to the Las Vegas massacre began in the same fashion as America's failed experiment with the Tommy Gun; that is, firearms manufacturers made the reckless decision to market a military weapon to the public. After World War II, the U.S. Army initiated a comprehensive study of combat casualties, concluding that current automatic weaponry was "valueless from the perspective of increasing the number of targets hit." *Id.* ¶ 54. This discovery led the Army to develop specifications for a new combat weapon: a lightweight firearm that would hold a large detachable magazine, expel ammunition with enough velocity to penetrate steel helmets, and deliver greater accuracy and lethality in automatic mode. *Id.* ¶ 55.

The AR-15 was born in response. Built to deliver controllable automatic fire, the AR-15 also allowed for semi-automatic and three-round burst firing. *Id.* ¶ 56. This "selective fire" feature afforded soldiers flexibility to adapt to the exigencies of battle. *Id.* Reports from Vietnam were glowing; with a single round, the AR-15 could decapitate, dismember, and leave "hole[s] about five inches in diameter." *Id.* ¶ 59. The Pentagon was informed that an AR-15 in

---

[3] The shooter used most of the weapons until the magazine he had attached ran out of ammunition. On two weapons, however, one of the FNH FN15s and the LMT Defender 2000, the shooter expended a 100-round magazine and attached a second, which he then partially expended. Compl. ¶¶ 157-58.

automatic mode was "superior in virtually all respects" to previous machine guns.  *Id.* ¶¶ 57, 59.  The military adopted the AR-15 as its standard-issue rifle, renaming it the M16.  *Id.* ¶ 58.

When the Vietnam War wound down and military demand declined, manufacturers faced a choice: learn from history, or repeat it.  They chose the latter and looked to cultivate a civilian market for the AR-15.  *Id.* ¶ 61.  They did so despite the fact that every aspect of the AR-15's design advanced the rationale for its existence: to deliver effective, automatic fire in combat.  *Id.* ¶¶ 54-62.  Rather than decommission the weapon or redesign it, manufacturers made only minimal adjustments so that automatic fire could no longer be "selected" by a shooter.  *Id.* ¶¶ 62-64.  They preserved the weapon's core design so that the AR-15's internal parts were interchangeable with M16 parts.  *Id.*  Exterior components like the stock, barrel and rail system were also untouched and therefore interchangeable.  *Id.* ¶ 65.  A cottage industry sprang up in response: interchangeable military-grade parts sold separately, conversion kits, and various gadgets that harness the weapon's capacity for automatic fire.  *Id.* ¶ 72, 86.[4]

It was an ideal arrangement for evading Congress's regulatory goals for machine guns.  Firearms manufacturers produced weapons they could claim were semiautomatic (despite the ease of conversion), while purveyors of parts and gadgets provided the means of conversion.  The danger of this new, symbiotic relationship was not lost on either Congress or the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the agency charged with interpreting and enforcing the NFA.  *Id.* ¶ 67, 75.  Over the course of a decade, the government employed a two-pronged approach in an effort to effectuate the public safety goals of the NFA.  *See id.* ¶¶ 67-80.

From 1968-1986, the definition of "machinegun" was expanded to keep up with the modification industry; by 1986, it included machine gun frames and receivers, conversion kits,

---

[4] Some machine gun enthusiasts have even proven that the AR-15 can produce automatic fire with nothing more than a shoestring or a rubber band.  Compl. ¶ 83.

combinations of machine gun parts, and any part "designed and intended" to be used for converting a weapon into a machine gun. *Id.* ¶¶ 69, 80. Congress also amended the statute to cover firearms that "can be readily restored to shoot" automatically. *Id.* ¶ 70.

Beginning in 1981, the Attorney General and ATF turned their attention to the root of the problem: easily-convertible, semiautomatic weapons. That year, a Task Force on Violent Crime was convened, which sounded the alarm and explicitly called out manufacturers' role.

> Another problem we wish to address is the ease of conversion of semi-automatic guns into more lethal and more strictly regulated fully automatic guns…. Some manufacturers are producing readily available semi-automatic weapons which can easily be converted to fully automatic weapons by simple tool work *or the addition of readily available parts*.

*Id.* ¶ 74 (emphasis added). It was unnecessary for Congress to amend the NFA to address this problem, because the statute already defined a machine gun as "any weapon . . . *designed to shoot* . . . automatically." Thus, in 1982, ATF issued a ruling explaining that "designed to shoot" refers to "those weapons which have not previously functioned as machineguns but possess design features which facilitate full automatic fire by simple modification or elimination of existing component parts." *Id.* ¶ 75. It was a clear signal that firearms manufacturers, who determine weapon design, were also responsible for the scourge of automatic weapons. *Id.* ¶ 77.

Manufacturers ignored this directive, continuing to produce AR-15 as susceptible to modification as ever. *Id.* ¶ 92. As a result, the modification industry flourished. Over the last decade, devices have been developed that capitalize on the AR-15's design features to generate the automatic fire the weapon was built for. *Id.* ¶ 86. One of these devices is known generically as a "bump stock." *Id.* ¶ 87. A bump stock replaces the stock of an AR-15 and modifies the weapon so that a continuous firing sequence is initiated with a single trigger pull. *Id.* ¶¶ 87-89.

The Akins Accelerator was an early iteration of the bump stock that came on the market in 2006. *Id.* ¶ 90. According to its patent application, the Accelerator produced continuous fire

with a single depression of the trigger and the immobilization of the shooter's trigger finger.  *Id.*
The Akins Accelerator was recalled after ATF found it was a machine gun; but Mr. Akins found
an easy workaround, then renamed the device and put it back on the market.  *Id.* ¶ 91.   The
company with whom Mr. Akins partnered sold it online with the following description:

> Ever wonder what it would feel like to own a Machine Gun? Heck Yeah, who
> doesn't. . . . The Bumpski is the civilian legal way to convert your semi-auto
> rifle to bump firing, lead throwing, brass spitting rifle that you have always
> dreamed of owning. Simply replace your existing stock with the FosTech kit
> that matches your rifle and away you go.  *Id.*

In 2010, a bump stock called Slide Fire came on the market.  *Id.* ¶ 93.  Like the Akins
Accelerator, the Slide Fire bump stock replaced the AR-15's stock and modified the weapon so
that the shooter could cycle fire with a single trigger pull.  *Id.* ¶ 94.  The Slide Fire website
advised customers to "[m]ake sure your finger is tightly seated on the finger rest and that it does
not move while you are shooting your firearm.  After years of shooting by moving your finger,
it can be a hard habit to break."  *Id.*  Slide Fire also "improved" the bump stock design,
facilitating modification in minutes, with only a screwdriver.  *Id.* ¶ 95.  The device's inventor
has boasted that "Slide Fire brings shooters the same full auto experience" as a fully automatic
firearm.  *Id.* ¶¶ 96-97.

The Defendants in this case not only knew that their AR-15s were designed for
automatic fire and could be easily modified, but also advertised those qualities.  Defendants
courted buyers by advertising their AR-15s as military weapons.  Many used the term "Mil-
Spec," shorthand for military specifications, *id.* ¶¶ 106, 113, 115, 123, or described their
weapons as "directly descended" from military weaponry.  *Id.* ¶ 127.  Other Defendants invoked
the weapon's military bona fides more descriptively: "the Ultimate Fighting Machines that just
won't quit," *id.* ¶ 109; "built to withstand the varied and unrelentingly harsh conditions of
battlefields around the world," *id.* ¶ 111; and "built for combat reliability in all conditions."  *Id.*

¶ 107.  Defendants also clearly signaled the ease of modification.  Defendants hailed their AR-15s as "modular," the industry term for modifiable.  *E.g., id.* ¶¶ 109, 121.  Others promised that their AR-15 model "shares many parts with its combat-proven brother," *id.* ¶ 117, or is built from parts that "should interchange with other mil-spec components."  *Id.* ¶ 115.  Defendant LMT even emphasized speed of modification, boasting of a new stock "designed to replace current adjustable stocks in less than twenty seconds with no special tools."  *Id.* ¶ 121-22.

At least two of the Defendants were even more brazen in their open acknowledgment – or expectation – of conversion.  Advertising using Defendant Colt's trademark demonstrated the compatibility between a Slide Fire bump stock and Colt's AR-15s.  *Id.* ¶ 119.  In 2016, as a result of an agreement between Slide Fire and Colt, a Colt AR-15 was sold with a Slide Fire bump stock already "integrated."  *Id.* ¶ 120.  And Defendant Christensen Arms included in its AR-15 user manual that "any damage or malfunction due to fully automatic operation and any other modification to this firearm" voids the company's warranties.  *Id.* ¶ 123.

Defendants' marketing emphasis on the AR-15's military roots and modifiability sent a clear message.  The Las Vegas shooter was listening.  From November 2016 to July 2017, he purchased twelve of Defendants' AR-15s and more than a dozen bump stocks.  *Id.* ¶¶ 105-26, 130.  As advertised, he was able to easily modify each AR-15 with a bump stock.  *Id.* ¶¶ 129, 138.  They then delivered the ferocious automatic fire associated with mil-spec rifles "built for combat reliability in all conditions."  *Id.* ¶ 107.

Carrie Parsons, a 31-year-old enjoying a concert with friends on her way home to Seattle and her new fiancé, was gunned down hundreds of yards from the shooter, having already escaped the venue and reached the street.  *Id.* ¶¶ 164-168.  The weapon that killed her was sold eight decades after the NFA was enacted to protect Americans from the terror of machine guns, *id.* ¶¶ 3, 38; thirty-five years after ATF made clear that weapons with design features that

7

facilitate conversion to automatic fire are illegal under federal law, *id.* ¶¶ 73-75; eleven years after ATF held that a bump stock was a machine gun, *id.* ¶ 91; seven years after Slide Fire promised simpler conversion for the "full auto experience," *id.* ¶¶ 93-87; and within five years of Sandy Hook, Aurora, Orlando, and other tragedies demonstrating that the AR-15 was the weapon of choice for mass shooters seeking to inflict maximum casualties. *Id.* ¶ 102.

The Plaintiffs, Carrie's parents, have brought claims for wrongful death and negligence per se based on Defendants' violation of federal and state law prohibiting the manufacture and sale of machine guns. Plaintiffs have also pled negligent entrustment.

## LEGAL STANDARD

On a motion to dismiss, "[a]ll well-pleaded allegations of material fact in the complaint are accepted as true and construed in the light most favorable to the non-moving party." *Faulkner v. DAT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013) (internal citations omitted). To survive a motion to dismiss, a plaintiff must only allege facts that are "plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009). "[A] complaint need not contain detailed factual allegations; rather, it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs easily meet this standard.

## ARGUMENT

### I. Defendants Violated Federal Law Because They Sold Weapons That Were Statutorily Machine Guns.

PLCAA provides that a gun manufacturer or seller can be liable for harms caused to third parties when that "manufacturer or seller knowingly … violated a State or Federal statute applicable to the sale or marketing [of firearms], and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii) (the "predicate exception"). In

8

this case, Plaintiffs have alleged Defendants violated Section 922(b)(4) of the Gun Control Act which prohibits the sale or delivery of machine guns.[5]  Defendants suggest that, as a matter of law, Plaintiffs cannot state a claim under the predicate exception because the "Subject Rifles" are not machin eguns.  *See* Def. Mot. at 11.  This argument ignores the exhaustive factual allegations in Plaintiffs' Complaint.  Accepted as true, as they must be, Plaintiffs' allegations more than demonstrate that Defendants knowingly violated the Gun Control Act by selling "machine guns" as defined by federal law.

### A.  A "Machinegun" is Any Weapon "Designed to Shoot" Automatically.

The Gun Control Act of 1968, 18 U.S.C. §921 *et seq.*, ("GCA"), as amended by the Firearm Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986) ("FOPA"), imposes both a regulatory licensing scheme and criminal prohibitions on specified firearms transactions. As relevant to this case, the GCA makes it unlawful for a "licensed manufacturer [or] licensed dealer" to "sell or deliver…to any person any…machinegun," unless specifically authorized by the Attorney General.  18 U.S.C. § 922(b)(4).  The GCA incorporates by reference the definition of "machinegun" in the National Firearms Act, 26 U.S.C. § 5845(b) ("NFA").  The NFA defines a "machinegun" as "any weapon which shoots, *is designed to shoot*, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  26 U.S.C. § 5845(b) (emphasis added).

Pursuant to Congress's express delegation, ATF has promulgated regulations clarifying the meaning of Section 5845(b)'s phrase "designed to shoot," explicitly distinguishing it from the other two categories of weapons covered by the statute's text.  *See* 26 U.S.C. § 7805; *see id.* § 7801(a)(2)(A) (providing that the Attorney General "shall prescribe all needful rules and

---

[5] Plaintiffs also allege that Defendants violated Nevada Law prohibiting the manufacture and sale of machine guns, NRS 202.350(1)(b).  Compl. ¶¶ 173, 192.  Because this statute is modeled after the federal statute and uses the same definition of machine gun, it is not discussed separately.

regulations for the enforcement" of the NFA).   ATF regulations instruct that the phrase "designed to shoot" includes "those weapons which have not previously functioned as machineguns but possess design features which facilitate full automatic fire by simple modification or elimination of existing component parts."   ATF Ruling 82-2.   That common-sense definition has been widely adopted by federal courts throughout the country.   *See, e.g.*, *United States v. TRW Rifle 7.62X51mm Caliber, Model 14,* 447 F.3d 686, 688 n.2 (9th Cir. 2006) (citing ATF Rule 82-2); *United States v. TRW Model M14, 7.62 Caliber Rifle,* 441 F.3d 416, 4210 n.4 (6th Cir. 2006) (same); *S.W. Daniel, Inc. v. United States*, 831 F.2d 253, 254 (11th Cir. 1987) (approving a jury charge repeating Rule 82-2).

This statutory scheme delineates three distinct categories of weapons that constitute "machineguns."   The first category – weapons that "shoot…automatically" – is the most straightforward and refers to those weapons that fire automatically when sold.   The second category – weapons that can be "readily restored to shoot… automatically" – refers to those weapons that fire automatically in their "original" manufactured state but have been modified in some way so as to temporarily block the weapon's automatic capabilities.   *U.S. v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 691 (9th Cir. 2006) (M-14 machine gun that was cut in half, welded back together, and modified to remove automatic function fell within the category of "readily restored to shoot").   The third category – weapons that are "designed to shoot… automatically" – refers to weapons that were not manufactured to have automatic firing capabilities when sold but have design features that facilitate easy modification to fully automatic capabilities.

Throughout their brief, Defendants fail to grapple with how "designed to shoot" functions within Section 5845(b) as a whole.   Defendants argue repeatedly that the Complaint's

10

1
2
3
4
5
6
7
8
9
10

allegation that Defendants' weapons fire automatically only after modification[6] is a concession that Defendants' rifles are not machine guns.  *E.g.*, Def. Mot. at 12.  This reveals a fundamental misunderstanding of Section 5845(b).  Weapons that fire automatically *without* modification are covered by the first clause.  *See* 26 U.S.C. 5845(b) (a machine gun is "any weapon which shoots . . . automatically. . .").  Defendants' proffered interpretation would collapse the distinction between weapons "designed to shoot" automatically and weapons that "shoot[] automatically," rendering the former superfluous.  Basic canons of statutory construction dictate this cannot be so.  It is a "cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute."  *Williams v. Taylor*, 529 U.S. 362, 364 (2000).

11
12

### B.  Plaintiffs Have Adequately Pled That Defendants Sold Weapons "Designed to Shoot" Automatically and Did So Knowingly.

13
14
15
16
17
18

Plaintiffs' Complaint is replete with factual allegations demonstrating that Defendants' weapons "possess[ed] design features which facilitate full automatic fire by simple modification or elimination of existing component parts."  ATF Rule 82-2.  The Complaint also details how Defendants, with knowledge of that fact, continued peddling the weapons that armed the Las Vegas shooter, enabled the length and lethality of his attack, and caused Carrie's death.

19
20
21
22
23
24
25
26
27

Indeed, the AR-15 was designed for the *sole* purpose of providing the military with a superior combat weapon that would "increas[e] the numbers of targets hit" in automatic mode.  Compl. ¶ 54; *see id.* ¶¶ 55-56, 60.  It delivered on that promise, proving "superior in all respects" to other automatic weaponry.  *Id.* ¶¶ 57-59.  When manufacturers started selling a "civilian version" of the AR-15, they preserved the core design of the weapon.  *Id.* ¶¶ 62-65.  That is why AR-15s can be shot automatically with a shoestring, a rubber band, or just the shooter's shoulder.  *Id.* ¶¶ 83-84.  That is why M16 parts are interchangeable with AR-15 parts.

28

---

[6] This is not actually true, since Plaintiffs allege the AR-15 can produce automatic fire using only the shooter's shoulder.  Compl. ¶ 84.

*Id.* ¶ 64.  That is why bump stocks are made to modify AR-15s, not handguns.  *Id.* ¶¶ 86-87.

And that is why Defendants advertise that the AR-15 has not strayed from its original, machine

gun roots: these are "modular," "mil-spec" weapons that are "directly descended" from the

M16; constructed from parts that "should interchange with other mil-spec components"

(sometimes in "less than twenty seconds with no special tools"); and "built for combat

reliability in all conditions."  *Id.* ¶¶ 106-27.

Defendants continued manufacturing, selling, and aggressively advertising their

weapons with full knowledge of the AR-15's origin and corresponding design features; the

demand for illicit automatic weaponry among a subset of civilians; the ease of modification to

automatic firing capabilities through simple hacks; and the availability of bump stocks and

similar devices through which their weapons could be easily modified to become fully

automatic.  *Id.* ¶¶ 63, 100, 171.  Defendants also acted with full knowledge of the 1982 ATF

ruling defining the contours of the NFA's "designed to shoot" language, *id.* ¶ 171, as well as the

"repeated legislative efforts to address the catastrophic danger posed by easily modifiable

weapons."  *Id.* ¶ 81.  Yet, Defendants "did nothing to change the design features of the weapon

that rendered it susceptible" to this "simple modification."  *Id.* ¶ 92.  Indeed, their marketing

indicates they both *expected* such modification, *e.g.*, *id.* ¶ 123 (Christensen Arms user manual

warned that "any damage or malfunction due to fully automatic operation and any other

modification to this firearm" would void the company's warranties), and *welcomed* it.  *E.g.*, *id.*

¶ 120 (Colt partnered with Slide Fire to sell Colt AR-15 already modified with a bump stock).

These facts are beyond "plausibly suggestive" of Plaintiffs' claim that Defendants

knowingly violated the GCA by selling weapons that fall squarely under the NFA's definition

of machine gun.  *Moss*, 572 F.3d at 969.  No more is required at this juncture.  It will fall to a

jury to resolve, with the assistance of expert testimony, the fact-intensive (and mechanically

technical) issues embedded in the question of whether the weapons sold by Defendants and used by the shooter were statutorily machine guns.  *See United States v. Fleischli*, 119 F. Supp. 2d 819, 821 (C.D. Ill. 2000) ("Since the gun's classification [as a machine gun] is an element of a § 922(*o*) offense, it is obviously a jury question."); *cf. United States v. Guard*, 2 F.3d 1158 (9th Cir. 1993) (affirming conviction for possession of a machine gun; jury had enough evidence to convict based on expert testimony explaining the significance of the addition of parts and the drilling of two holes, indicating "the frame of a semi-automatic rifle . . . had been modified to support a weapon that could fire automatically").

### C.  Defendants' Arguments Ignore the Facts as Pleaded in the Complaint and the Procedural Posture of Their Motion.

Defendants' brief offers a litany of reasons why Plaintiffs fail to state a claim, each of which should be rejected.

*First*, Defendants appear to argue that their weapons cannot have been "designed to shoot" automatically, as ATF has defined that term, because the bump stock modification does not involve "existing component parts."  *See* Def. Mot. at 13.  This fact-based argument is at odds with both the allegations of the Complaint and a common sense understanding of how a bump stock works.

The first step in modifying an AR-15 with a bump stock is to remove – or eliminate – the existing stock.  Compl. ¶ 95.  This alone satisfies the ATF definition because "a 'stock' is a component part of a rifle," and an "integral" one at that, because "it permits the firearm to be fired from the shoulder."  *Prescott v. Slide Fire Sols., LP*, 341 F. Supp. 3d 1175, 1189 (D. Nev. 2018); *id.* at 1188 (citing to ATF Guidebook, which identifies the stock as a component part).  Next, a separate stock is attached in place of the prior stock and secured.  Compl. ¶ 87.  Once the bump stock is attached, depressing the trigger initiates a self-acting firing mechanism that causes the trigger to "automatically reengage" until all ammunition is exhausted.  83 Fed. Reg.

13

66,514-55; *see also* Compl. ¶¶ 94, 87, 88.  In other words, without the bump stock, the trigger resets after each trigger pull but does not continue firing; with the bump stock, it resets and fires continuously.  It is hard to imagine how this fundamentally different firing mechanism is not a "modification" of "existing component parts."[7]  *Cf. United States v. Camp*, 343 F.3d 743, 744 (5th Cir. 2003) (upholding conviction for possession of a machine gun where defendant "modified [a] semiautomatic rifle" by using a fishing rod and external motor to continuously activate the trigger).  And to the extent there is disagreement on the technical meaning of "existing component part" in the context of a bump stock modification to one of Defendants' rifles, it cannot be settled at the pleadings stage.

*Second*, Defendants pin their hopes on ATF Rule 81-4, which designated the AR-15 "auto sear" a machine gun because it was designed to convert a weapon into a machine gun. Defendants suggest the ruling vindicates their position because ATF used the phrase "semiautomatic rifles" to refer to AR-15s and did not declare AR-15s to be machine guns.  Def. Mot. at 16 ("[T]he mere existence of this conversion kit did not transform [the subject weapons] into machineguns under the 'designed' definition, as ATF characterized them as 'AR15 type *semiautomatic rifles*.") (emphasis added by Defendants).  This argument fails.

Rule 81-4 predated Rule 82-2, meaning ATF had not yet promulgated the definition of "designed to shoot" that is relevant here.  Moreover, Defendants cannot be correct that use of the term "semiautomatic" to describe the AR-15s at issue in Rule 81-4 is somehow proof of the non-machine gun status of Defendants' weapons in this case.  We know this because ATF uses the same term when explicitly describing machine guns.  In Rule 82-2, for example, ATF

---

[7] Defendants also seem to find it significant that modification through a bump stock does not involve "cutting, filing, or grinding" the weapon.  *See* Def. Mot. at 15.  However, they fail to offer any reason why that distinction would be salient, let alone dispositive, here.  Rule 82-2 is clear that the relevant inquiry is *whether* the weapon is being modified – not *how* it is modified.

describes the KG-9 as a "9-millimeter caliber, *semiautomatic* firearm."   ATF Rule 82-2 (emphasis added).  In the next paragraph, however, it notes that the KG-9's design facilitates automatic fire through simple modification and that the weapon is thus a "machinegun" for the purposes of the NFA.  Defendants' attempt to capitalize on the term "semiautomatic" in Rule 81-4 is yet another example of their deliberate distortion of what "designed to shoot" means.  Acknowledging that certain AR-15s are sold as "semiautomatic rifles" has no relevance to whether a weapon is "designed to shoot" automatically for the purposes of the statute.

*Finally*, Defendants lean on the fact that the bump stocks used by the shooter were not classified as machine guns until March of 2019, well after Defendants manufactured and sold the weapons at issue in this case.  *See* Def. Mot. at 16-18.  Defendants, citing to *Prescott*, mention a letter ATF issued to Slide Fire in which ATF concluded that "the bump-stock is a firearm part and is not regulated as a firearm under [the] Gun Control Act of the National Firearms Act."  Def. Mot. at 17 (citing *Prescott*, 341 F. Supp. 3d at 1189).

This is a good argument for Slide Fire, but it does not exonerate the Defendants.  This case is about weapons manufacturers, and Defendants' argument improperly conflates the legality of bump stocks and other conversion devices with the legality of the weapons themselves.[8]  Plaintiffs' claim in this case is that Defendants manufactured weapons that were "designed to shoot... automatically" in violation of federal law.  *See* 26 U.S.C. § 5845(b).  The regulatory classification of bump stocks at the time of manufacture does not answer that question.

---

[8] It is also not clear why Defendants believe that reliance on a one paragraph letter from ATF to a bump stock manufacture is dispositive – particularly when ATF subsequently acknowledged that such "rulings concerning bump-stock-type devices did not provide substantial or consistent legal analysis regarding the meaning of the term 'automatically,' as it is used in the NFA and GCA."  83 Fed. Reg. 66,514-55.

Instead, the answer requires analyzing whether Defendants' weapons "have design features which facilitate full automatic fire" by simple modification. ATF Rule 82-2. One route to "simple modification" is through the use of bump stocks; or, in the prescient words of the 1981 Task Force, "the addition of readily available parts." *See* Compl. ¶¶ 86-87, 74. As the Complaint makes clear, "bump stock" is merely a *type* of device, *id.* ¶ 87, and different iterations have been treated differently by ATF – something the agency readily acknowledges. *Id*. ¶¶ 90-91; *see supra* fn. 8. Defendants cannot rest their case on one letter to one bump stock manufacturer, Def. Mot. at 17, while ignoring Plaintiffs' allegations that other bump stocks, deemed legal, "unequivocally converted AR-15s into fully automatic machine guns." Compl. ¶ 92. That reliance is particularly unpersuasive when "[t]he *plain language* of [Section 5845(b)] defines a machinegun as any part or device that allows a gunman to pull the trigger once and thereby discharge the firearm repeatedly," *Akins v. United States*, 312 F. App'x. 197, 201 (11th Cir. 2009) (emphasis added) – which is precisely what a bump stock does.

Moreover, due to the AR-15's specific design, "simple modification" is not confined to bump stocks. *See* Compl. ¶ 83 (noting videos showing "the AR-15 being shot automatically in back yards and at shooting ranges with a shoe string, a rubber band, or with no tools at all"); *id.* ¶ 84 (pointing to a particular video in which a man produces automatic fire with an AR-15 "using only his shoulder"). What is pertinent is Defendants' knowledge of the design features of their own weapons that facilitated "simple modification," by any means, into fully automatic weapons. Plaintiffs' Complaint sufficiently alleges such knowledge.

### D.  Defendants' Reliance on *Staples* Is Misplaced.

Defendants declare in their brief that "[t]he Supreme Court has recognized that rifles like the subject rifles are not machineguns." Def. Mot. at 14. The basis for this bold assertion is *Staples v. United States*, 511 U.S. 600 (1994), which Defendants claim "held that a semi-

automatic firearm is not a machinegun." Def. Mot. at 15.  This is fundamentally incorrect. *Staples* concerned a criminal prosecution under 26 U.S.C. § 5861(d), which criminalizes possession of unregistered "firearms," including machine guns.  The issue before the Court was whether, in a criminal prosecution under Section 5861(d), the government was required to prove that the defendant *knew* of the characteristics that made his weapon a "machinegun" under the statute.  *Staples*, 511 U.S. at 602.  The Court held that such a *mens rea* requirement existed under Section 5861(d).  *Id.* at 619.  At no point did the Court hold, as Defendants suggest, that weapons such as the ones at issue in this case can never be "machineguns" for purposes of Section 5845.  That question was simply not addressed.[9]

Defendants point out that the Court in *Staples* "recognized the difference," *see* Def. Mot. at 14, between an AR-15 (the "civilian version of the military's M-16 rifle" that is "unless modified, a semi-automatic weapon"), and an M-16 (a "selective fire rifle" that allows for either "semiautomatic or automatic fire").  *Staples*, 511 U.S. at 603.  This is true, but unhelpful.  As explained above, there is no dispute as to those differences at the time of manufacture of those respective weapons.  Plaintiffs do not argue that Defendants' weapons are "category one" weapons under the statute – i.e., weapons that "shoot" automatically.  *See* 26 U.S.C. 5845(b). Instead, the relevant question in this case is whether Defendants' weapons were "designed to shoot" automatically, an issue upon which *Staples* does not speak.

---

[9] Defendants who have endeavored to use *Staples* as controlling authority on the contours of Section 5845 have been consistently rebuffed because "[t]he narrow holding from *Staples* is that *mens rea* was an element of the crime in question."  *United States v. Olofson*, 563 F.3d 652, 657 (7th Cir. 2009) (rejecting argument that Court's definition of "automatically" in *Staples* was controlling because the Court was not interpreting § 5845(b)); *see also Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1, 29 (D.C. Cir. 2019) (explaining that the Supreme Court's decision in *Staples* did not "compel a particular interpretation" of the meaning of "single function of the trigger," because that question was "not at issue" before the Court).

In a last-ditch attempt to use *Staples* as a shield, Defendants cherry-pick language from a footnote in the majority opinion, which addresses the dissenters' view that the dangerous nature of defendant's weapon – a "semiautomatic weapon that [is] readily convertible into a machinegun" – should lessen the *mens rea* requirement. In response, the majority notes that Section 5861(d) penalizes the possession of any NFA "firearm" that is unregistered and "does not suggest that any significance should attach to readily convertible semiautomatics." *Staples*, 511 U.S. at 612 n.6. Critically, the Court goes on to say that "it is not at all clear what the contours of this category would be," and that the concept of ready conversion "provides no real guidance concerning the required *mens rea*." *Id.* (emphasis added). Defendants' quotation from this footnote omits that language entirely. That is no accident – a full account of the footnote makes clear that the Court is not speaking to the "contours" of what constitutes a machine gun, and, moreover, is looking only for "guidance" on *mens rea*. The Court's refusal to use "readily convertible semiautomatic weapons" as a "benchmark for defining the knowledge requirement for 5861(d)," *see id.*, simply does not touch on whether Defendants' weapons *in this case* were machine guns for the purposes of Section 5845(b). [10]

## II.  Plaintiffs have Stated a Claim for Negligence Per Se.

The Nevada Supreme Court has "consistently held that the violation of a statute constitutes negligence per se if the injured party belongs to the class of persons that the statute was intended to protect, and the injury suffered is of the type the statute was intended to

---

[10] Defendants' brief also suggests that Congress, by passing the 1994 assault weapon ban, "recognized" that the Subject Rifles are not machine guns. *See* Def. Mot. at 18-19. But this is hardly dispositive. First, Congress' decision to pass FOPA in 1986 and implicitly endorse ATF Rule 82-2 is much more relevant to Congress' intended meaning of "machinegun" in the NFA than the assault weapons ban. Second, the definition of "machinegun" was not at issue when Congress passed the assault weapons ban. And third, Defendants' argument yet again suffers from the misapprehension that the use of the term "semiautomatic" somehow ends the discussion – a view that is contradicted by the plain text of the NFA.

prevent." *Vega v. E. Courtyard Associates*, 24 P.3d 219, 221 (Nev. 2001).  Consistent with this, Plaintiffs allege that Defendants[11] violated federal and state law when they sold weapons that facilitated automatic fire.  The purpose of the prohibition on the manufacture and sale of machine guns is to "protect members of the public from physical injury and death caused by machine guns."  Compl. Count II ¶ 204; *see also* ¶¶ 35-40.  Carrie Parsons, who was fatally shot with automatic fire, is exactly who these statutes were designed to protect.  *Id.* ¶¶ 165-68, Count II ¶ 206.

Having adequately pled those elements, "[t]he questions of whether a violation of a statute occurred and whether the violation was a proximate cause of the plaintiff's injuries are questions of fact for the jury."  *Barnes v. Delta Lines, Inc.*, 669 P.2d 709, 711 (Nev. 1983); *see also Zugel by Zugel v. Miller*, 688 P.2d 310, 312 (Nev. 1984).  The Defendants nevertheless argue that the Parsons' claim should be dismissed because penal statutes cannot form the basis for a negligence per se claim unless the statute explicitly provides for a private right of action.  Def. Mot. at 9-10.  In fact, in Nevada, "[t]he use of a violation of a criminal statute as the basis for common-law negligence has been upheld in this state, as well as many others."  *Southern Pacific Co. v. Watkins*, 83 Nev. 471, 435 P.2d 498 (1967); *see also Hamm v. Carson City Nugget*, 85 Nev. 99, 450 P.2d 358 (1969) ("[W]e have recognized that a violation of a penal statute is negligence per se."); *cf.* Prosser & Keeton on Torts, § 36 p. 220 (5th Ed. 1984) ("The standard of conduct required of a reasonable man may be prescribed by legislative enactment . . .

---

[11] PLCAA allows claims based on negligent entrustment and negligent entrustment to proceed against a "seller."  15 U.S.C. § 7905(5)(A)(ii).  "Seller" is defined to mean a federally licensed importer, dealer, or seller of ammunition – all of which are further defined by federal law.  *Id.* § 7903(6).  The Defendant Dealers must be federally licensed dealers (or else they are in clear violation of an additional federal law).  As such, plaintiffs' negligence claims are permitted as to those three Defendants.  At this procedural posture, however, plaintiffs cannot know whether one or more of the Defendant Manufacturers is also a statutory "seller" under PLCAA. Plaintiffs are entitled to conduct discovery on that issue.

. The fact that such legislation is usually penal in character … will not prevent its use in imposing civil liability[.]").

And Defendants are incorrect that "in the absence of evidence of legislative intent to impose civil liability, a violation of a penal statute is not negligence per se." Def. Mot. at 10. Defendants support this proposition by quoting from and citing to *Hindegardner v. Marcor Resorts*, L.P.V., 108 Nev. 1091, 844 P.2d 800 (1993), and *Bell v Alpha Tau Omega Fraternity, Eta Epsilon Chapter*, 98 Nev. 109, 642 P.2d 161 (1982). Both cases are completely inapt. They arise from claims related to the negligent provision of alcohol – a cause of action that Nevada courts do not recognize unless specifically provided for by the legislature. *See generally Hamm*, 85 Nev. at 100-02 (reviewing common law rule, affirming it, and noting that "civil liability in this situation should be created by legislative act, if at all"). The language Defendants rely on merely reiterates that rule. *See Hinegardner*, 844 P.2d at 803 (Court will "continue to follow the *Hamm* rule—only legislative mandate should create civil liability for vendors who serve alcohol to minors.").[12]

*Hindegardner* and *Bell* have no relevance here, where the provision of alcohol is not involved. Indeed, *Hamm* makes clear that alcohol-related claims are an *exception* to the general rule that penal statutes may form the basis for a negligence per se claim in Nevada, even without evidence of clear legislative intent. *Hamm*, 85 Nev. at 102. The Parsons have pled such a claim. The remaining issues belong to the trier of fact.

---

[12] Further proof that Defendants are incorrect can be found in *Watkins*, where the statute plaintiffs relied upon for negligence per se made no mention of a private cause of action. *See* 83 Nev. at 491; § 705.430.

### III.   Plaintiffs have Stated a Claim for Negligent Entrustment.

One of the causes of action preserved under PLCAA is "an action brought against a seller for negligent entrustment."    15 U.S.C. § 7903(5)(A)(ii).[13]    In Nevada, negligent entrustment occurs when an instrumentality is entrusted "in circumstances where [the entrustor] knows or should that such use may create an unreasonable risk of harm to others."  *Mills v. Continental Parking Corp.*, 86 Nev. 724, 726, 475 P.2d 673, 674 (1970).  Plaintiffs allege that Defendants' entrustment of weapons that could easily be modified for automatic fire created just such an unreasonable risk.  Compl. ¶¶ 204-11.

Defendants argue that negligent entrustment is only recognized in the context of "entrusting a vehicle to an inexperienced or incompetent person."  Def. Mot. at 6 (citing *Zugel*, 688 P.2d at 312).  This misstates the law.  While Nevada cases generally deal with negligent entrustment in the context of automobiles – and lending a car is likely to be negligent in circumstances where the entrustee is "inexperienced or incompetent" – no Nevada case states that negligent entrustment is so limited as a matter of law.

Indeed, this artificial restriction is at odds with the tort of negligent entrustment spelled out in the Restatement, which recognizes a claim for the entrustment of any "chattel."  Rest. (2d) Torts § 390.  It is the Restatement that has guided states when considering the application of the tort outside the context of cars.  *E.g.*, *West v. E. Tennessee Pioneer Oil Co.*, 172 S.W.3d 545, 555 (Tenn. 2005) ("In line with a majority of other states, this Court has previously cited section 390 with approval in defining negligent entrustment,").  And it is particularly relevant

---

[13] Although PLCAA does not create negligent entrustment liability and must arise under state law, *see id.* § 7903(5)(C), PLCAA defines negligent entrustment with language that substantially tracks the Restatement of Torts:  Negligent entrustment is "the supplying of a qualified product by a seller for use by another person when the sellers knows, or reasonably should know, the person to whom the product is supplied is likely to, and does use, the product in a manner involving unreasonable risk of physical injury to the person or others."  *Id.* § 7903(5)(B); *compare with* Rest. (2d) Torts § 390.

here, since the PLCAA definition of negligent entrustment "is substantially the same as the Restatement version." *Estate of Kim v. Coxe*, 295 P.3d 380, 394 & n.89 (Alaska 2013). Moreover, Nevada has a history of relying upon the Restatements Second of Torts on tort issues that Nevada has not specifically addressed. *E.g. Arnesano v. State ex. rel. DOT*, 113 Nev. 815, 822-23, 942 P.2d 139, 144 (1997) (regarding causation); *San Juan v. PSC Indus. Outsourcing*, 126 Nev. 355, 360-361, 240 P.3d 1026, 1029-30 (2010) (regarding vicarious liability).

### IV.    Plaintiffs Have Adequately Alleged Causation.

Defendants argue that Plaintiffs cannot establish that Defendants proximately caused Carrie's death. Def. Mot. at 22-23. In Nevada "issues of negligence and proximate cause are usually factual issues to be determined by the trier of fact." *Frances v. Plaza Pacific Equities, Inc.*, 109 Nev. 91, 94 (1993). Defendants also ignore Plaintiffs' many allegations that a mass shooting committed with a bump-stock-modified AR-15 was manifestly foreseeable.

Defendants were aware that (1) machine guns had been restricted due to concern for public safety since 1934, Compl. ¶¶ 3, 37-38, 81, 171; (2) for decades there had been an enthusiastic audience of consumers interested in owning a modular weapon capable of automatic fire," *id.* ¶¶ 82-83, 100, 171; (3) the ease of conversion increased with the advent of bump stocks, which, in "a few minutes," could be "installed… with nothing more than a screwdriver," *id.* ¶¶ 95, 98, 171; and (4) these bump stocks were specifically compatible with Defendants' AR-15 models. *Id.* ¶¶ 99-100, 129. Yet Defendants "continued to manufacture their respective AR-15 rifles so that the stock could be easily removed and replaced with a bump stock." *Id.* ¶ 100.

Defendants made these choices despite "a decade's worth of evidence … proving that AR-15s were the weapon of choice for mass shooters looking to inflict maximum casualties." *Id.* ¶ 102; *see also id.* ¶ 11. And because "America's mass shooters seek fame by death tally,"

1
2
3

"[i]t was not just possible – or even probable – that a gunman would take advantage of the ease of modifying AR-15s to fire automatically in order to substantially increase the body count during a mass shooting.  It was inevitable."  *Id.* ¶ 13.

4
5
6
7
8
9
10
11
12
13
14
15
16

Defendants' attempt to cast the shooter as a "third party commit[ing] an intentional tort or a crime" that "severs the chain of causation" is a red herring.  Def. Mot. at 22.  Civilian access to machine guns is so tightly restricted because "[a] modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds."  *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (citation omitted).  The risk created by selling an illegal machine gun is that this "murderously effective firepower," *id.*, will be turned against civilians and law enforcement, as it was on October 1, 2017 in Las Vegas.  *Cf. Price v. Blaine Kern Artista, Inc.*, 893 P.2d 367, 370 (Nev. 1995( "[W]hile it is true that criminal or tortious third-party conduct typically severs the chain of proximate causation between a plaintiff and a defendant, the chain remains unbroken when the third party's intervening intentional act is reasonably foreseeable.").

17
18
19
20
21
22
23
24
25
26
27
28

### V.    Nevada's Narrow Immunity Statute Does Not Bar Plaintiffs' Claims.

Finally, Defendants argue that Plaintiffs' claims are barred by NRS § 41.131.  *See* Def. Mot. at 20-22.  The statute's plain text, however, makes clear this is not the case.  *See Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 935 F.3d 858, 869 (9th Cir. 2019) ("[I]t is axiomatic that we resolve questions of statutory interpretation starting with the text").  The statute only prohibits causes of actions against firearm manufacturers or distributors brought "merely because the firearm or ammunition was *capable of causing serious injury, damage or death*."  NRS 41.131 (emphasis added).  Plaintiffs' Complaint cannot plausibly be reduced to such a claim.  Rather, Plaintiffs clearly allege that Defendants knowingly violated federal and state law by selling and distributing machine guns.

Defendants' reliance on *Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 3d 1216 (D. Colo. 2015) to suggest otherwise is misguided.  In *Phillips*, the Colorado statute at issue prohibited any action against a firearms manufacturer or dealer "*for any remedy* arising from physical or emotional injury, physical damage, or death caused by the discharge of a firearm or ammunition." *Phillips*, 84 F. Supp. 3d at 1221 (citing C.R.S. § 13-21-504.5) (emphasis added). By its plain terms, the Colorado statute is far broader than the Nevada statute upon which Defendants rely.[14]  Section 41.131 is no bar to plaintiffs' claims.

**CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request the Court deny Defendants' Motion to Dismiss.

DATED this 22nd day of November 2019.

Respectfully submitted by:

  /s/ Matthew L. Sharp
Matthew L. Sharp
Nevada State Bar No. 4746
432 Ridge Street
Reno, NV 89501

Richard H. Friedman
Nevada State Bar No. 12743
FRIEDMAN │ RUBIN PLLP
1126 Highland Avenue
Bremerton, WA 98337

Joshua D. Koskoff (Admitted *PHV*)
Katherine L. Mesner-Hage (Admitted *PHV*)
KOSKOFF, KOSKOFF & BIEDER, PC
350 Fairfield Ave.
Bridgeport, CT 06604

*Attorneys for Plaintiffs*

---

[14] Defendants also rely on the California case *Merrill v. Navegar, Inc.*, 28 P.3d 116 (Cal. 2001). Yet, the law at issue in *Merrill*, like the Nevada statute at issue here, only prohibits causes of action based on a firearm's "potential to cause serious injury, damage, or death when discharged." *Merrill*, 28 P.3d at 119.  Such a cause of action is not present in this case.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiffs' Opposition to Defendants' Motion to Dismiss the Complaint was electronically served on counsel of record this 22nd day of November, 2019, using the Court's CM/ECF System and via email to:

Scott C. Allen - sallan@renzullilaw.com
John F. Renzulli - jrenzulli@renzullilaw.com
Christopher Renzulli - crenzulli@renzullilaw.com
Jay J. Schuttert - jschuttert@efstriallaw.com
Alexandria L. Layton - alayton@efstriallaw.com
Bryon J. Benevento - benevento.bryon@dorsey.com
Patrick G. Byrne - pbyrne@swlaw.com
V.R. Bohman - vbohman@swlaw.com
Camden R. Webb - crwebb@williamsmullen.com
Robert C. Van Arnam - rvanarnam@williamsmullen.com
Justin S. Feinman - jfeinman@williamsmullen.com
Turner Broughton - tbroughton@williamsmullen.com
John H. Mowbray - jmowbray@spencerfane.com
Mary E. Bacon - mbacon@spencerfane.com
Jessica Chong - jchong@spencerfane.com
Anthony Pisciotti - apisciotti@pmlegalfirm.com
Ryan Erdreich - rerdreich@pmlegalfirm.com
Danny C. Lallis - dlallis@pmlegalfirm.com
Loren Young - lyoung@lgclawoffice.com
Ismail Amin - iamin@talglaw.com
Jessica Guerra - jguerra@talglaw.com
Christopher M. Chiafullo - cchiafullo@chiafullogroup.com
James Vogts - jvogts@smbtrials.com
Michael Nunez - mnunez@murchisonlaw.com


_____/s/ Katherine Mesner-Hage_____
Katherine L. Mesner-Hage (Admitted *PHV*)
KOSKOFF, KOSKOFF & BIEDER, PC
350 Fairfield Ave.
Brideport, CT  06604
(203) 336-4421
jkoskoff@koskoff.com
khage@koskoff.com