# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JAMES PARSONS, INDIVIDUALLY AND
AS SPECIAL ADMINISTRATOR OF THE
ESTATE OF CAROLYN LEE PARSONS, *et
al.*,

     Plaintiffs

v.

COLT'S MANUFACTURING COMPANY,
LLC, *et al.*,

     Defendants

Case No.: 2:19-cv-01189-APG-EJY

**Order Granting in Part Defendants'
Motion to Dismiss**

[ECF No. 80]

Carrie Parsons was killed in the October 1, 2017 mass shooting in Las Vegas.  Her

parents, plaintiffs James Parsons and Ann-Marie Parsons, sue the manufacturers[1]

(Manufacturers) and dealers[2] (Dealers) that made and sold the AR-15 rifles used in the shooting.

The Parsons assert claims for wrongful death, negligence per se, and negligent entrustment.  The

wrongful death and negligence per se claims are premised on the Parsons' contention that the

defendants manufactured and sold firearms that were designed to shoot automatically, rendering

them illegal machine guns under federal and Nevada law.

The defendants move to dismiss the Parsons' complaint, arguing that their claims are

barred by the Protection of Lawful Commerce in Arms Act (PLCAA), Nevada Revised Statutes

(NRS) § 41.131, and common-law causation principles.  I dismiss the Parsons' negligent

entrustment and negligence per se claims without leave to amend because they fail to state a

---

[1] Colt's Manufacturing Company LLC, Colt Defense LLC, Daniel Defense Inc., Patriot
Ordnance Factory, FN America, Noveske Rifleworks LLC, Christensen Arms, Lewis Machine &
Tool Company, and LWRC International LLC.

[2] Discount Firearms and Ammo LLC, Sportsman's Warehouse, and Guns and Guitars Inc.

1 cognizable claim.  The Parsons plead a wrongful death claim that is not barred by the PLCAA or

2 common-law causation principles, but I will certify questions regarding the proper interpretation

3 of NRS § 41.131 to the Supreme Court of Nevada.

4 **I.   BACKGROUND[3]**

5      Congress enacted the National Firearms Act in 1934 to combat an important national

6 problem: the use of machine guns, like the so-called Tommy Gun, in gang shootings. ECF No. 1

7 at 15.  The Act imposed a 100% tax on machine guns, which were defined as firearms with the

8 ability to fire "more than one shot, without manual reloading, by a single function of the trigger."

9 *Id.* at 16.  Congress later banned machine guns outright and expanded their definition to include,

10 among other things, conversion kits enabling semi-automatic rifles to fire automatically. *Id.* at

11 19.

12      The AR-15 rifle was designed as a military weapon called the M-16 and first saw use in

13 the Vietnam War. *Id.* at 17-18.  The M-16's "selective fire" feature enabled soldiers to choose

14 between fully automatic, semi-automatic, and three-round burst firing. *Id.* at 17.  As the Vietnam

15 War wound down, AR-15 manufacturers turned to the civilian market. *Id.* at 18.  Rather than

16 design a new weapon, the manufacturers removed the selector switch from the AR-15. *Id.*

17 Redesign was cost-prohibitive, while removal of the selector switch was cost-effective and

18 allowed marketing of the weapon's military bona fides. *Id.*  AR-15 exterior components like the

19 stock, barrel, and rail system were preserved as removeable and interchangeable with M-16 parts

20 (a feature the firearm industry calls "modularity"). *Id.* at 18-19.  The Manufacturers named in

21 this case emphasized the AR-15's military bona fides or modularity in their marketing. *Id.* at 23–

22 25.

23

---

[3] The facts set forth below reflect the Parsons' allegations.  They are not factual findings.

Over the past decade, new devices called "bump stocks" have been developed to enable reliable and continuous automatic fire by capitalizing on the AR-15's recoil and removable stock. *Id.* at 21.  An AR-15 equipped with a bump stock will continually fire rounds with a single trigger pull, replicating automatic fire. *Id.*  Videos available on the internet show the ease of installing a bump stock, and the Slide Fire bump stock can be installed with "nothing more than a screwdriver." *Id.* at 22.

Despite their knowledge of the availability of bump stocks, the Manufacturers continued to manufacture AR-15s with a stock that can be easily removed and replaced. *Id.*  Slide Fire advertised, using the Colt trademark, its bump stock's compatibility with Colt's AR-15. *Id.* at 24. As the result of an agreement between Colt and Slide Fire, a Colt Competition AR-15 was sold with a Slide Fire bump stock already "integrated."[4] *Id.* at 25.  Christensen Arms' AR-15 manual warned users that "any damage or malfunction due to fully automatic operation and any other modification to this firearm" voids its warranties. *Id.*

Between November 23, 2016 and July 5, 2017, the October 1 shooter[5] purchased from the Dealers twelve AR-15 rifles made by the Manufacturers. *Id.* at 23-25.  The shooter removed the stocks from the weapons and replaced them with bump stocks. *Id.* at 26.  On October 1, the shooter used the AR-15s equipped with bump stocks to fire 1,049 rounds in less than ten minutes, killing 58 people and injuring hundreds. *Id.* at 28.  One of the rounds hit Carrie Parsons in the shoulder. *Id.*  Carrie was transported to the hospital before succumbing to her wound. *Id.* at 29.

---

[4] The Parsons do not allege that this type of Colt AR-15 was used in the October 1 shooting.

[5] I will not name him.

The Parsons assert three causes of action against the defendants: (1) wrongful death under NRS § 41.085 caused by the defendants' design, manufacture, and sale of AR-15s that were capable of automatic fire through simple modification in knowing violation of 18 U.S.C. § 922(b)(4) and NRS § 202.350(1)(b); (2) negligence per se, premised on violations of the same statutes; and (3) negligent entrustment. *Id.* at 35. The defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that the claims are barred by the PLCAA, NRS § 41.131, and general causation principles. ECF No. 80. I held oral argument on this motion and took it under advisement. ECF No. 97.

## II. DISCUSSION

In considering a motion to dismiss under Rule 12(b)(6), "all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). However, I do not assume the truth of legal conclusions merely because they are cast in the form of factual allegations. *See Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994). A plaintiff must make sufficient factual allegations to establish a plausible entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Such allegations must amount to "more than labels and conclusions, [or] a formulaic recitation of the elements of a cause of action." *Id.* at 555. "As a general rule, [d]ismissal without leave to amend is improper unless it is clear . . . that the complaint could not be saved by any amendment." *Sonoma Cty. Ass'n of Retired Emps. v. Sonoma Cty.*, 708 F.3d 1109, 1118 (9th Cir. 2013) (quotation omitted).

### A. The PLCAA and its Exceptions

The PLCAA provides that a "qualified civil liability action may not be brought in any Federal or state court." 15 U.S.C. § 7902(a).

> The term "qualified civil liability action" means a civil action or proceeding . . . brought by any person against a manufacturer or seller of a [firearm] . . . for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party . . . .

*Id.* §§ 7903(4)-(5)(A).  However, this definition is subject to six exceptions, including: (1) "an action brought against a seller for negligent entrustment or negligence per se" and (2) "an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought. . . ." *Id.* §§ 7903(5)(A)(ii)-(iii).

A seller is one who is "engaged in the business" as a firearms dealer and licensed to "engage in business" as a firearms dealer. *Id.* § 7903(6)(b).  The term "manufacturer" is defined separately. *Id.* § 7903(2).

The Parsons have not alleged facts showing that the Manufacturers are sellers within the PLCAA's meaning.  I therefore dismiss the Parsons' negligent entrustment and negligent per se claims against the Manufacturers on this basis.  I deny leave to amend because, as discussed below, the Parsons cannot allege plausible negligence per se or negligent entrustment claims even if they could allege facts showing that the Manufacturers are sellers.

**B.  Negligent Entrustment**

The PLCAA permits negligent entrustment actions against sellers for "the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others." *Id.* § 7903(5)(b).  Under Nevada law, a "negligent entrustment theory may apply where one who has the right to control [an instrumentality] permits another to use it in circumstances where he

5

knows or should know that such use may create an unreasonable risk of harm to others, [but] it does not apply when the right to control is absent." *Mills v. Cont'l Parking Corp.*, 475 P.2d 673, 674 (Nev. 1970). Although Nevada negligent entrustment caselaw relates solely to motor vehicles, Nevada courts have not foreclosed application of the doctrine outside of that context. Indeed, the Restatement (Second) of Torts § 390 extends negligent entrustment to "chattels."

The Parsons' state law negligent-entrustment claim fails because they do not allege that the defendants had a right to control the shooter's AR-15s after they manufactured and sold them. In any event, the focus of the negligent entrustment tort at common law and under the PLCAA definition is on the entrustor's knowledge of the entrustee, not the instrumentality entrusted. The Connecticut Supreme Court recently affirmed dismissal of a similar negligent entrustment claim against gun manufacturer Bushmaster for this reason. *Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 282-283 (Conn. 2019). The Parsons plead no facts showing that the Manufacturers or Dealers knew that permitting the shooter to use an AR-15 would create an unreasonable risk of harm. So I dismiss the Parsons' negligent entrustment claim against both the Manufacturers and Dealers, without leave to amend because the Parsons are not pursuing a cognizable negligent entrustment claim.

**C. Negligence Per Se**

The PLCAA allows claims against sellers for negligence per se but it does not define negligence per se. 15 U.S.C. §7903(5)(A)(ii). Under Nevada law, "violation of a statute may constitute negligence per se only if the injured party belongs to the class of persons that the statute was intended to protect, and the injury is of the type that the statute was intended to prevent." *Sagebrush Ltd. v. Carson City*, 660 P.2d 1013, 1015 (Nev. 1983). The Supreme Court of Nevada has twice rejected negligence per se claims premised on violations of alcohol laws,

1  reasoning that "[i]n the absence of legislative intent to impose civil liability, a violation of a

2  penal statute is not negligence per se." *Hinegardner v. Marcor Resorts, L.P.V.*, 844 P.2d 800,

3  802 (Nev. 1992); *Bell v. Alpha Tau Omega Fraternity, Eta Epsilon Chapter*, 642 P.2d 161, 162

4  (Nev. 1982).  In *Hinegardner,* the court inferred from the legislature's silence that it did not

5  intend to impose civil liability. 844 P.2d at 802.

6       These decisions cited and reaffirmed the Supreme Court of Nevada's decision in *Hamm*

7  *v. Carson City Nugget, Inc.*, which rejected a negligence per se claim premised on violations of

8  alcohol laws.  The *Hamm* court reasoned that the legislature made clear its intention not to

9  extend civil liability because it provided for civil liability in the immediately preceding section of

10 the statute. 450 P.2d 358, 360 (Nev. 1969).  The *Hamm* court recognized that "it had recognized

11 that a violation of a penal statute is negligence per se" in prior cases, but "decline[d] to so rule in

12 this case since to do so would subvert the apparent legislative intention." *Id.*

13      Given these cases, one could argue either way: that there is a presumption that a violation

14 of a penal statute is not negligent per se absent legislative intent, or that there is a presumption

15 that a violation of a penal statute is negligent per se absent legislative intent to the contrary.  But

16 federal courts applying Nevada law have opted for the former, and I do the same here. *See*

17 *Conboy v. Wynn Las Vegas, LLC*, No. 2:11-cv-01649-JCM-CWH, 2012 WL 5511616, at *3 (D.

18 Nev. Nov. 14, 2012); *Mazzeo v. Gibbons*, 649 F. Supp. 2d 1182, 1200 (D. Nev. 2009); *Harlow v.

19 LSI Title Agency*, Inc., No. 2:11-cv-01775-PMP-VCF, 2012 WL 5425722, at *3 (D. Nev. Nov. 6,

20 2012).

21      The Parsons' negligence per se claim is premised on the defendants' violations of federal

22 and state prohibitions of machine guns. 18 U.S.C. § 922(b)(4); NRS § 202.350(1)(b).  The

23 Parsons do not provide, and I have not found, evidence of either Congress's or the Nevada

7

legislature's intent to impose civil liability along with those prohibitions.  So I dismiss with prejudice the Parsons' negligence per se claim against the Manufacturers and Dealers.

### D. Wrongful Death

#### 1. PLCAA Exception

The PLCAA permits "action[s] in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii).  The Parsons' wrongful death claim is premised on the defendants' violations of 18 U.S.C. § 922(b)(4) and NRS § 202.350(1)(b), which prohibit firearms manufacturers and dealers from selling "machinegun[s]."  Machine gun is defined as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845.  Nevada's definition of "machine gun" mirrors the federal definition. NRS § 202.253.  The ATF has defined "designed to shoot" to include "those weapons which have not previously functioned as machineguns but possess design features which facilitate full automatic fire by simple modification or elimination of existing component parts." ATF Ruling 82-2.

The Parsons allege that the defendants knowingly violated 18 U.S.C. § 922(b)(4) and NRS § 202.350(1)(b) by manufacturing and selling firearms that were "designed to shoot . . . automatically more than one shot, without manual reloading by a single function of the trigger." 26 U.S.C. § 5845; *see also* NRS § 202.253.  And they allege that AR-15s are designed to shoot automatically because they possess a design feature—an interchangeable stock—that facilitates

full automatic fire by simple modification or elimination of the existing stock.  The Parsons plead numerous facts suggesting that this claim is plausible, including the defendants' use of stocks that can be easily replaced with bump stocks, the defendants' marketing of the AR-15's modularity and military bona fides, the defendants' knowledge that commercially-available bump stocks enabled AR-15s to fire automatically, Colt's agreement with Slide Fire, and Christensen Arms' recognition that the AR-15 could be modified to fire automatically.  The defendants raise a number of arguments against this conclusion.

The defendants first argue that in *Staples v. United States*, the Supreme Court of the United States held that semi-automatic rifles are not machine guns simply because they are "readily convertible" to machine guns. 511 U.S. 600, 612 n.6 (1994).  But the Court in that case was not considering the definition of a machine gun but rather whether 26 U.S.C. § 5861(d) required proof that the defendant knew the rifle he possessed had characteristics that made it a machine gun. *Id.* at 602; *see also United States v. Olofson*, 563 F.3d 652, 657 (7th Cir. 2009) ("The narrow holding from *Staples* is that mens rea was an element of the crime in question— i.e., that the government had to prove the defendant's knowledge of the features of the weapon (including automatic firing capability) that brought it within the proscriptive purview of [§ 5861(d)].").  The Supreme Court did not consider the meaning of "designed to shoot" or commercially-available parts facilitating rapid conversion to machine guns.  Indeed, the term "readily convertible" does not appear in the definition of a machine gun. 26 U.S.C. § 5845.  And passing references distinguishing semi-automatic rifles from automatic weapons are dicta.  So *Staples* does not require dismissal of this case.

The defendants next point to three ATF rulings.[6]  First, they point to the definition of "designed to shoot" in ATF Ruling 82-2 as weapons "possess[ing] design features which facilitate full automatic fire by simple modification or elimination of existing component parts." They argue that because installation of a bump stock involves elimination and replacement of an existing component part, the existence of bump stocks do not mean that AR-15s are "designed to shoot" automatically.  The Parsons argue that the definition of "designed to shoot" is satisfied because installation of a bump stock involves elimination of the existing stock.  For purposes of a motion to dismiss, this allegation supports a plausible claim for relief.

ATF Ruling 81-4 addressed whether an AR-15 Auto Sear conversion kit consisting of a "sear mounting body, sear, return spring, and pivot pin" was "a combination of parts designed and intended for use in converting a weapon . . . ."  And ATF Ruling 2006-2 addressed whether an early bump stock device was "a part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun." So the ATF was considering only whether the third-party components themselves were machine guns.  The ATF did not consider whether the weapons these parts could be installed in were "designed to shoot" automatically.  Passing references to the weapons as semi-automatic rifles prior to conversion do not support the defendants' contention that as a matter of law the existence of third-party components cannot transform a semi-automatic rifle into a machine gun.

---

[6] The parties do not fully address what weight should be accorded to the ATF rulings, which interpret the term "designed to shoot" in statutory and regulatory definitions of machine guns. Other courts have cited them, but do not address whether they are entitled to deference. *See United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006*, 447 F.3d 686, 688 (9th Cir. 2006).  Because it does not appear the rulings were the product of notice and comment proceedings or are entitled to so-called *Auer* deference, I give deference to them only insofar as they have the "power to persuade." *See United States v. Mead Corp.*, 533 U.S. 218, 227 (2001); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019).

The defendants make a number of arguments that ultimately address whether they knowingly violated 18 U.S.C. § 922(b)(4) and NRS § 202.350(1)(b), including that: (1) bump stocks were legal at all relevant times during the lawsuit, and it was not until after the shooting that the ATF reclassified bump stocks as a machine gun; (2) if semi-automatic rifles like the AR-15 are machine guns, Congress and the states would not have needed to ban them outright in various assault weapons bans; and (3) the Department of Justice has not prosecuted the defendants for illegally manufacturing and selling AR-15s. But these arguments ignore the Parsons' well-pleaded allegations that (1) bump stocks have emerged only in the past decade and (2) the defendants knew these bump stocks allowed their AR-15s to fire automatically through simple modification. So these arguments do not merit dismissal for failure to state a claim.

The defendants argue in reply, and repeatedly stated in oral argument, that the Parsons are asking me to "make hundreds of thousands of United States citizens who lawfully manufactured, sold, purchased, and/or possessed AR-type rifles felons overnight." ECF No. 92 at 2. The Parsons' allegations are narrower. They allege that these defendants knowingly manufactured and sold weapons "designed to shoot" automatically because they were aware their AR-15s could be easily modified with bump stocks to do so. The Parsons have alleged a wrongful death claim that is not precluded by the PLCAA.

## 2. Causation

"[W]hile it is true that criminal or tortious third-party conduct typically severs the chain of proximate causation between a plaintiff and a defendant, the chain remains unbroken when the third party's intervening intentional act is reasonably foreseeable." *Price v. Blaine Kern Artista, Inc.*, 893 P.2d 367, 370 (Nev. 1995). Under Nevada law, "issues of negligence and proximate

11

1  cause are usually factual issues to be determined by the trier of fact." *Frances v. Plaza Pacific*

2  *Equities, Inc.*, 847 P.2d 722, 724 (Nev. 1993).

3         Daniel Defense and Sportsman's Warehouse point to the Supreme Court of Nevada's

4  decision in *Thomas v. Bokelman* to argue that the Parsons must allege the defendants had

5  knowledge of the shooter's propensity for violence to establish causation. ECF No. 93 at 7

6  (citing 462 P.2d 1020 (Nev. 1970)).  In that case, the court held that it was not foreseeable that a

7  convicted rapist who had access to an unsecured rifle would murder someone because "[t]he risk,

8  if any, was that [t]he rapist might rape someone." *Thomas*, 462 P.2d at 1022.  However, a

9  reasonable fact finder might conclude that the risk of manufacturing and selling AR-15s that

10  could be easily modified to fire automatically was that a bad actor might do exactly that and use

11  them in a mass shooting.  So *Thomas* does not require dismissal.

12         The defendants argue that the shooter's criminal conduct severs the chain of proximate

13  causation.  But the Parsons plead facts from which a reasonable fact finder could conclude that

14  the shooter's use of an AR-15 modified to shoot automatically in a mass shooting was

15  reasonably foreseeable.  The danger of machine guns has been well known since the 1930s,

16  when their use in gang shootings prompted the National Firearms Act.  Machine guns are illegal

17  because they can kill or injure large numbers of people in a short period of time.  And the

18  Parsons plead facts showing that the defendants' AR-15s could be easily modified with bump

19  stocks to shoot automatically, which the shooter did with tragic results.  So the Parsons have

20  sufficiently alleged causation.

21      **3.  NRS § 41.131**

22         Under Nevada law, "[n]o person has a cause of action against the manufacturer or

23  distributor of any firearm or ammunition merely because the firearm or ammunition was capable

of causing serious injury, damage or death, was discharged and proximately caused serious

injury, damage or death." NRS § 41.131.  The statute states it is "declaratory and not in

derogation of the common law" and includes an exception for actions based on production or

design defects. *Id.*

The defendants argue this statute bars the wrongful death claim because the Parsons do

not allege that the AR-15s used in the October 1 shooting were defective.  The Parsons respond

that their suit falls outside of § 41.131's reach because their central allegation is that the

defendants violated federal and Nevada law by manufacturing and selling illegal machine guns.

Thus, they contend, they are not suing the defendants "merely" because the firearms were

capable of causing—and caused—their daughter's death.

The text and legislative history are open to multiple reasonable interpretations.  The text

appears to provide broad immunity to firearms manufacturers and distributors, but the term

"merely" must be given meaning.  Similarly, the defendants point to one senator's statement that

it was the bill's sponsor's intent "to not have a firearms manufacturer sued by his heirs if he were

murdered." Hearing on S.B. 211 Before the S. Comm. on Judiciary, 1985 Leg., 63rd Leg. Sess.

(Nev. Apr. 17, 1985).  But the sponsor of the bill began the discussion by noting that "[s]uits are

being brought such as a person injured in a hunting accident saying the person who sold the gun

and the manufacturer were at fault." *Id.*

Section 41.131 was enacted in 1985, but Nevada courts have yet to interpret it.  The

parties have not identified, and I have not found, a federal or state decision that has even cited it.

I would ordinarily predict how the Supreme Court of Nevada would interpret the statute. *See*

*Orkin v. Taylor,* 487 F.3d 734, 741 (9th Cir. 2007).  But this case presents important public

policy concerns for the state of Nevada that should be addressed by the Nevada court.  I am

particularly concerned by the defendants' concession in oral argument that under their

interpretation § 41.131 would immunize even a defendant that manufactured and sold Tommy

guns or M-16 rifles to civilians.  The Supreme Court of Nevada should be allowed to interpret

§ 41.131 on first impression. *See Thompson v. Paul*, 547 F.3d 1055, 1065 (9th Cir. 2008)

("Certification of open questions of state law to the state supreme court can in the long run save

time, energy, and resources and helps build a cooperative judicial federalism, but its use in a

given case rests in the sound discretion of the federal court." (quotations and alterations

omitted)).  So I will certify by separate order the following questions to the Supreme Court of

Nevada:

- Does a plaintiff asserting a wrongful death claim premised on allegations that firearms manufacturers and dealers knowingly violated federal and state machine gun prohibitions have "a cause of action against the manufacturer or distributor of any firearm . . . merely because the firearm or ammunition was capable of causing serious injury, damage or death, was discharged and proximately caused serious injury, damage or death[,]" under Nevada Revised Statutes § 41.131?

- Does Nevada Revised Statutes § 41.131 allow a wrongful death claim premised on allegations that firearms manufacturers and dealers knowingly violated federal and state machine gun prohibitions because the statute is "declaratory and not in derogation of the common law"?

In the interim, I deny this portion of the defendants' motion to dismiss without prejudice to

refiling it within 30 days of the Supreme Court of Nevada's decision.

## III.    CONCLUSION

I THEREFORE ORDER that the defendants' **motion to dismiss (ECF No. 80) is**

**GRANTED in part and DENIED in part.**  The plaintiffs' negligent entrustment and

negligence per se claims are dismissed without leave to amend.  The motion to dismiss the

/ / / /

1  plaintiffs' wrongful death claim is denied without prejudice to refiling it within 30 days of the

2  Supreme Court of Nevada's decision on the certified questions.

3        DATED this 10th day of April, 2020.

4

5                                              _____
                                               ANDREW P. GORDON
                                               UNITED STATES DISTRICT JUDGE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23